Donald SLAVEN; Salvatore Russo; Carl Gassaway; Yeriko Nitta, d/b/a the Seacliff Motel; Salvatore Manzella; Steven Panto and Donna Panto; Heinz Pet Products Company, A Division of Star–Kist Foods, Inc., a California Corporation; Gregory Kuglis; and Jack Morici, On Behalf of Themselves and All Similarly Situated, Plaintiffs,

v.

BP AMERICA, INC.; BP Oil Shipping Co., U.S.A.; BP Oil Supply Company; American Trading Transportation Company, Inc.; American Trading and Production Corp.; the Trans–Alaska Pipeline Liability Fund; Golden West Refining Company; and Brandenburger Marine, Inc., Defendants.

Nos. CV 90–0722–RJK, CV 90–0733–RJK, CV 90–2619–RJK, CV 90–1151–RJK, CV 91–0334–RJK and CV 91–0515–RJK.

United States District Court,
C.D. California,
In Admiralty.

Feb. 10, 1992.

Robert E. Coppola, William P. Barry, Kenneth E. Johnson, Baker & Hostetler, McCutchen Black, Long Beach, Cal., for BP Oil Shipping Co. USA, BP Oil Supply Co. and BP America, Inc.

John S. Gray, Law Offices of John S. Gray, Fountain Valley, Cal., for Newport Sailing Club, Inc.

Daniel E. Lungren, Atty. Gen., Roderick E. Walston, Chief Asst., Sylvia Cano Hale, Deputy, Office of Atty. Gen., Los Angeles, Cal., Dennis M. Eagan, Deputy, Linus Masouredis, Deputy, Oakland, Cal., for State of Cal.

Gail Hutton, City Atty., Huntington Beach, Cal., Law Offices of James H. Ackerman, Long Beach, Cal., for City of Huntington Beach.

Philip D. Kohn, City Atty., Rutan & Tucker, Costa Mesa, Cal., for City of Laguna Beach.

Joseph M. Murphy, Newport Beach, Cal., for Jack Morici.

Thomas M. Crehan, San Pedro, Cal., for G. Nazzareno, Inc., Sea Queen, Inc., Bimbo, Inc., United Food Processors, Ltd., Fishermen's Ass'n of San Pedro, Trama Fishing Co., Inc., Maria Fishing, Inc., St. George II, Inc., Maria T., Inc., N.N.P.F. Enterprises, Inc., Fiore Enterprises, Inc., Nonna Maria Fishing, Inc. and Ingrande Palma, Inc.

Gregory W. Stepanicich, City Atty., City of Seal Beach, Quinn M. Barrow, Michael G. Colantuono, Richards, Watson & Gershon, Los Angeles, Cal., for City of Seal Beach.

Michael F. Minchella, Monteleone & McCrory, Universal City, Cal., Dennis J. Kelly, Anita Benjamin, Kelly, Cox, Wootton, Welch, Gill & Sherburne, San Francisco, Cal., for Steve P. Rados, Inc.

Francis J. MacLaughlin, White & Case, Los Angeles, Cal., James Robertson, A. Stephen Hut, Jr., Alan N. Braverman, Wilmer, Cutler & Pickering, Washington, D.C., for Trans–Alaska Pipeline Liability Fund.

Jack Corinblit, Marc M. Seltzer, Gretchen Nelson, Corinblit & Seltzer, Los Angeles, Cal., Merrill G. Davidoff, Harold Berger, Daniel Berger, Peter Nordberg, Berger & Montague P.C., Philadelphia, Pa., Christina A. Snyder, Katten Muchin Zavis & Weitzman, Los Angeles, Cal., Stephen D. Oestreich, Ellen P. Chapnick, Wolf, Popper, Ross, Wolf & Jones, New York City, for Chet Holifield and Don Slaven as class representatives.

Adrian Kuyper, County Counsel, Carol D. Brown, Deputy, Michael R. Capizzi, Dist. Atty., Jan J. Nolan, Deputy, County of Orange, Santa Ana, Cal., for County of Orange.

Robert H. Burnham, City Atty., Robin Flory, Asst., City of Newport Beach, Newport Beach, Cal., for City of Newport Beach.

Joseph N. Mirkovich, Carlton E. Russell, Russell & Mirkovich, Long Beach, Cal., for Brandenburger Marine, Inc.

George J. Tomlinson, Santa Barbara, Cal., for Peter Guglielmo and Aniello Guglielmo.

Erich P. Wise, Nicholas S. Politis, Michael J. Swain, Angelo F. Piersanti, Gra-

ham & James, Long Beach, Cal., for Golden West Refining Co.

Stewart M. Gerson, Ricard B. Stewart, Asst. Attys. Gen., Robert L. Brosio, U.S. Atty., Roger E. West, First Asst. Chief, Los Angeles, Cal., Philip A. Berns, Atty. in Charge, Bob Cunningham, Karen Dworkin, U.S. Dept. of Justice, San Francisco, Cal., for U.S.

Howard D. Sachs, San Pedro, Cal., for Salvatore Russo, Steven A. Panto, Donna L. Panto, Steven J. Panto, Danielle D. Panto, Salvatore Manzella, Tommy Manzella, Sam Carr, Steve Mardesich, Angelo LoGrande, Jo LoGrande, Peter Paul LoGrande, Benedetto LoGrande, Vicko T. Fiamengo, Frank Fricia, Mildred Fricia, Gregory Kuglis, Andrew Kuglis, Steven Burklund, Frank Iacono, Joe Cracchiolo, Vincent Ferrera, Carl Gassaway, John M. Doherty, Guiseppe Russo, Vince Lauro, Joe Caruso, Frank Trama, Jack MacDowd, Jim Grammatico, Vito Rinaudo, Branko Sindicich, Vito Battaglia, Don A. Kusar, Dominic Balestrieri, Crescenzo Iacono, Sam Randazzo, John Dorio and Robert Barker, II.

Patrick Marley, Cole & Marley, Los Angeles, Cal., for Sport Fishing Assn. of California and United Anglers of California.

Fred J. DiBernardo, San Pedro, Cal., George V. Allen, Jr., Jeffrey L. Yablon, Maryelena Pardo, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for State Fish Co., Inc., St. Joseph Assn, Inc., John Aiello, Bill Hargrave, Santa Maria Fishing, Inc., Vito A. Gioiello, Anna Maria, Inc., Attillo Gioiello, Bernard J. Mattera, Qualy Pak Foods, Inc., Sea Lanes II, Inc., Sea Scout, Inc. and Ferrigino Enterprises, Inc.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, Senior District Judge.

## I. INTRODUCTION

On November 4, 1991, the Court heard oral argument on the following motions:

1. Motion of defendant Trans–Alaska Pipeline Liability Fund ("Fund") for judgment on the pleadings pursuant to Fed. R.Civ.P. Rule 12(c) on the claims asserted in CV 91–334 by State Fish Company, Inc.

and Qualy Pak Foods, Inc. and in CV 90–722 by Nitta d/b/a the Seacliff Motel, Heinz Pet Products Company, and all other plaintiffs who are not commercial fishermen and did not suffer physical injury to their persons or property.

2. Motion of defendants BP America, Inc., BP Oil Shipping Co., U.S.A., and BP Oil Supply Company ("BP") for Rule 12(c) judgment on the pleadings on all claims in CV 90–722, CV 90–733, CV 91–334, and CV 91–515.

3. Motion of defendant American Trading Transportation Company, Inc. ("ATTRANSCO") to join in BP's Motion for 12(c) judgment in CV 90–722.

4. Motion of defendant Golden West Refining Company for dismissal for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. Rule 12(b)(6) in CV 90–722 of Counts 4 & 6 as asserted by plaintiffs Slaven, Gassaway, Nitta, Heinz and Kuglis and Count 5 as to all plaintiffs.

5. Motion of defendant Golden West for 12(c) judgment in CV 91–334.

6. Motion of defendant Golden West for 12(b)(6) dismissal in CV 91–515.

The Court took the matters under submission.

The disposition of these motions depends primarily upon the resolution of legal issues that are common to all the motions. Therefore, the court shall address the legal issues and then rule on each of the individual motions accordingly.

## A. Background

On 6/19/91 this Court held that the Trans–Alaska Pipeline Authorization Act, 43 U.S.C. § 1651 *et seq.* ("TAPAA"), did apply to this oil spill. 786 F.Supp. 840. All the parties agree that these consolidated cases fall under this Court's maritime jurisdiction and that therefore general maritime law applies. The two requirements for maritime jurisdiction are met since the oil spill 1) is a wrong that occurred on the high seas or navigable waters, and 2) bears a significant relationship to a traditional mar-

itime activity, here operating a vessel and engaging in maritime commerce. *See Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972); *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986).

### B. Standards for Rule 12(c) and 12(b)(6) Motions

In a Rule 12(b)(6) motion, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In a Rule 12(c) motion for judgment on the pleadings, the moving party must show that there are no material issues of fact to be resolved and that it is entitled to judgment as a matter of law. *General Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church,* 887 F.2d 228, 230 (9th Cir.1989), *cert. den.,* 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure*: Civil § 1368 (1969)). All the facts alleged in the complaint must be taken as true, and all reasonable inferences must be made and all doubts resolved in favor of the non-moving party. *Id.* Moreover, courts are reluctant to grant these motions where unsettled questions of law are involved. *Electrical Construction & Maintenance Co. v. Maeda Pacific Corp.,* 764 F.2d 619, 623 (9th Cir.1985) (quoting from 5 C. Wright & A. Miller, *Federal Practice and Procedure*: Civil § 1357 (1969)).

## II. DID TAPAA DISPLACE OR INCORPORATE THE PRIOR JUDGE MADE ADMIRALTY RULE OF *ROBINS DRY DOCK*?

### A. Introduction

The disposition of the bulk of these motions rests upon whether the various plaintiffs may collect damages for economic losses in the absence of physical injury on claims asserted under TAPAA and other federal and state law.

The starting point is *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), which established a federal maritime law rule that there can be no recovery for economic losses in the absence of compensable physical injury to the person or property. *Id.* at 135. The Court must determine what effect TAPAA, as subsequent legislation, has had upon this judge made rule.

### B. Discussion

#### 1. Statutory Scheme

43 U.S.C. § 1653(c)(1) of TAPAA creates a TAPAA cause of action in strict liability against the owner and/or operator of the vessel and the Fund. The maximum recoverable on these (c)(1) claims is $100 million. If the claims exceed that, they are prorated. § 1653(c)(3). For simplicity, the Court will refer to these causes of action as the (c)(1) claims.

(c)(8) provides that, if the accident was caused by negligence or the unseaworthiness of the vessel, the owner/operator and the Fund who paid the (c)(1) claims are subrogated to the rights of the (c)(1) plaintiffs under other applicable federal and state law. Thus, the parties who pay out in strict liability pursuant to (c)(1), may seek recoupment by pursuing pre-existing causes of action transferred to them pursuant to (c)(8). The Court will refer to these subrogated claims as the (c)(8) claims.

If any claim under (c)(1) is not satisfied in full, then the claimant can pursue any remedies available under other applicable state or federal law to recover the remainder. §§ 1653(c)(3) and (c)(9). The Court will refer to these nonTAPAA claims as (c)(3) claims, since (c)(3) expressly authorizes such supplemental recovery. *See* § 1653(c)(3) (last sentence).

In addressing the effect that TAPAA has on *Robins,* the Court thus recognizes that there are really three separate questions: what did TAPAA do to *Robins* with regard to its application to

1). (c)(1) TAPAA claims?

2). (c)(8) subrogated claims? and

3). (c)(3) nonTAPAA claims when applied to TAPAA oil?

## 2. Text of the Statute

The starting point for determining whether TAPAA incorporated, preempted, or set aside *Robins* is the text of the statute.

> Statutes which invade ... general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary in evident. No rule of construction precludes giving a natural meaning to legislation like this that obviously is of a remedial, beneficial and amendatory character. It should be interpreted so as to effect its purpose.

*Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 72 S.Ct. 1011, 1014–15, 96 L.Ed. 1294 (1952). *Isbrandtsen* shows how legislation can abrogate prior law .without specifying that it is doing so, and how the remedial intent of Congress should influence the interpretation.

■ " '[W]e start with the assumption' that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 1792, 68 L.Ed.2d 114 (1981), *cert. den.*, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 981 (1985) (*quoting Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). The standard for congressional abrogation of federal common law is weaker than that for abrogation of state law. *Id.* The proper test is whether the legislation "speaks directly to the question." *Id.* at 1791. "[T]he court[ ] must assess the scope of the legislation and whether the legislative scheme addresses the problem formerly governed by federal common law." *Gardiner v. Sea–Land Service, Inc.*, 786 F.2d 943, 947 (9th Cir. 1986), *cert. den.*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986) (citing *Milwaukee*, 101 S.Ct. at 1792 n. 8).

■ The plain language of (c)(1) indicates that it was intended to set aside, for the purposes of liability and recovery under (c)(1), all other laws limiting liability or recovery. The phrase "notwithstanding the provisions of any law" speaks directly to the question of whether other laws apply so as to alter the liability provided for therein. The answer is clearly that they do not. (c)(1) goes on to provide for recovery of "all damages."

Given the natural meaning of these words, the comprehensive scope of the legislation, *see In re Glacier Bay*, 944 F.2d 577 (9th Cir.1991), and its "remedial, beneficial, and amendatory" purpose, the Court is inclined to find that the statute set aside *Robins* as to the (c)(1) claims.

The objection has been made, though, that the statute does not really speak directly to the *Robins* question. It is argued that Congress was aware of the *Robins* rule and was purposely silent on the issue. It is argued that in saying "notwithstanding the provisions of any law" Congress was referring only to statutory law. If Congress had intended to overrule judge made law as well, the argument goes, it would have used the phrase "notwithstanding any other provision or *rule of law*." *Compare* 33 U.S.C. § 2702(a).

■ The Court will not engage in this kind of hairsplitting. It provides no reliable basis for divining Congressional intent. Furthermore, it is clear that Congress can abrogate prior law without specifying that law, *see Glacier Bay*, 944 F.2d at 583, or without stating that it is setting aside law at all. *See Isbrandtsen*, 72 S.Ct. at 1017.

The Court does find some merit in the argument that the statute incorporated *Robins* as part of the requirement of proximate cause. TAPAA does not have an express proximate cause requirement. It is beyond dispute that in such a case the common law requirement of proximate cause is implicitly incorporated. It is argued that *Robins* is merely a feature of that common law proximate cause doctrine.

It is true that the principle behind *Robins* is that economic damages without physical injury are too remote to be considered proximately caused by the defendant's ac-

tions. Yet, the bright-line rule of *Robins* is not a necessary component of the proximate cause concept.

The objection has also been made that doing away with *Robins'* limitation on recovery would be inconsistent with the purpose of the statute. It is argued that the Congressional purpose was to make compensation to the victims of oil spills more complete by increasing the amount of money available to those already entitled to recovery under existing law and making the money easier to access.[1] Increasing the categories of claimants, it is argued, would defeat the purpose of fuller recovery since it would dilute the pool.

The Court does not agree. Both the text of the statute and the legislative history suggest that Congress wanted to provide for better relief for those who suffer as a consequence of oil spills. There is no indication that the improvements were intended to benefit only those who were currently entitled to some relief and not to provide relief to additional parties. Rather, the huge increase in the size of the pool over what was available before (*see* ftn. 1) suggests that Congress may well have been intending to increase both the number of claimants and the recovery of each.

### 3. Legislative History

Although the Court is of the opinion that the meaning of the statute can be ascertained from the text alone, in considering these arguments it has looked at supplemental tools of statutory interpretation.

The comments in the conference report relevant to this issue are ambiguous and contribute more fuel to the debate than concrete answers. For example, in discussing existing limitations on recovery, the report refers specifically to the Limitation Act, but not to *Robins*. 1973 U.S.C.C.A.N. 2523. The report then reads: "The Confer-

ees concluded that existing maritime law would not provide adequate compensation to all victims ... in the event of the kind of catastrophe which might occur." *Id.* It also refers to all the limitations then existing in stating: "However, state governments and private parties are still obliged to proceed under maritime law, subject to the limits of liability contained in that body of law." *Id.*

These statements could demonstrate that the conferees intended to do away with all limitations on recovery, or that they intended to do away with only the dollar value limitation set by the Limitation Act. Such ambiguity and lack of comment cannot be reliable aid to determining Congressional intent.

### 4. The Regulations

In certain cases, if a statute is ambiguous, it may be appropriate for the court to defer to the reasonable interpretation of the statute put forth by the agency charged with its administration. Here, the regulations promulgated pursuant to TAPAA do provide for recovery of economic losses. *See* 43 C.F.R. § 29.1.

### 5. Subsequent Legislation

The Court has also been urged to look to later legislation, specifically the Oil Pollution Act of 1990 as evidence of what Congress intended in TAPAA. Subsequent legislation provides no reliable evidence of what Congress intended in TAPAA. OPA could have been intended to clarify and effectuate what Congress had originally intended in TAPAA, or to have made changes that were not made in TAPAA.

### 6. Other's Courts' Resolution of the Issue

The Court also notes three other District Court rulings on this issue. *Benefiel v.*

---

1. TAPAA increased the amount of money available for claimants by making owners and operators liable for the first $14 million in damages and creating the Fund that would compensate for additional damages up to $100 million. Prior to TAPAA, there was no Fund and recovery from the owner of the vessel was limited to the value of the vessel and cargo after the accident.

*See* Limitation of Liability Act, 46 U.S.C. §§ 181–189.

TAPAA also made the funds easier to access by providing that the victims could recover from the owner/operator and the Fund without having to prove fault. TAPAA shifted that burden to the TAPAA defendants pursuant to (c)(8).

*Exxon Corp.,* No. CV 90–2184–RG, 1990 WL 180503 (C.D.Cal. July 27, 1990) (TAPAA incorporated the *Robins* rule); *In re Exxon Valdez,* 767 F.Supp. 1509, 1515 (D.Alaska 1991) (TAPAA did preempt *Robins*); *In re Glacier Bay,* 746 F.Supp. 1379, 1384–86 (D.Alaska 1990) (same).

The Court is therefore convinced that TAPAA repeals *Robins* as to the (c)(1) claims. The next question is the status of *Robins* as to the (c)(3) and (c)(8) claims. The "notwithstanding" phrase in subsection (c)(1) does not have any effect on the nonTAPAA causes of action expressly reserved in (c)(3) and (c)(8). *See Glacier Bay,* 944 F.2d at 583.

### 7. Interrelationship of (c)(1), (c)(3), and (c)(8) Claims

■ The Ninth Circuit's recent holding in *Glacier Bay* provides a clue as to how the various claims interrelate. The *Glacier Bay* Court was called upon to determine the status of the Limitation Act after TAPAA. The Court assumed that TAPAA trumped the Limitation Act as to (c)(1) claims and went on to hold that it was repealed as to the (c)(3) and (c)(8) claims. *Id.*

The *Glacier Bay* Court determined that the Limitation Act was implicitly repealed because of the inconsistency between TAPAA's comprehensive remedial scheme and the provisions of the Limitation Act. The Court reasoned that TAPAA was intended to provide a prompt and relatively simple recovery by oil spill victims on a strict liability theory. *Id.* at 582. This recovery would be funded by the vessel's owner and/or operator and the Fund. Then, the owner/operator and the Fund could recoup what they had paid out from any party whose negligence, or maintenance of an unseaworthy vessel, was the cause of the spill. *Id.* The Court determined that this recoupment was intended to be total and that any limitation upon the liability of a responsible party would irreconcilably disrupt the overall plan. *Id.* at 583. Thus, the scope of the liability on the (c)(8) claims

must be the same as that on the (c)(1) claims.

But, the Court went further and held that the limitation was also repealed as to the (c)(3) claims. Thus, although the rationale for the ruling would dictate repealing the Limitation Act only as to the (c)(8) recoupment claims, the Court treated the (c)(8) and (c)(3) claims as one. *See id.* at 582–583.

Thus, the lesson of *Glacier Bay* seems to be that whatever limitations are repealed as to (c)(1) claims must be repealed as to (c)(8) claims so that there is total recoupment; and whatever limits are repealed as to (c)(8) claims are repealed as to (c)(3) claims because they are treated the same.

On the other hand, the parity in treatment of the (c)(3) and (c)(8) claims may have been a result of the fact that the Limitation Act was a prior statute and not a common law doctrine. The Court held that the statute was repealed in its entirety as to trans-Alaska oil. "We can only conclude that TAPAA was designed to supersede any conflicting law; by TAPAA's nature, it was intended to become *the* controlling statute with regard to trans-Alaska oil." *Id.* at 583 (emphasis in original).

Thus, it is clear from *Glacier Bay* that, since *Robins* is repealed as to the (c)(1) claims, that it is also repealed as to the (c)(8) claims. The issue of the (c)(3) nonTAPAA claims warrants further investigation.

### III. DOES 9TH CIRCUIT MARITIME LAW FOLLOW *ROBINS* RULE?

The (c)(3) claims are clearly governed by the Ninth Circuit maritime law. Thus the Court will turn to whether the Ninth Circuit follows *Robins.* There is no Ninth Circuit authority applying *Robins* directly. Nevertheless, the Ninth Circuit has clearly indicated that *Robins* applies in its discussion of the rule and its application of the "narrow exception" to *Robins* permitting commercial fishermen to recover purely economic losses. *Union Oil Co. v. Oppen,* 501 F.2d 558, 567 & 570 (9th Cir.1974); *Carbone v. Ursich,* 209 F.2d 178, 181–182

(9th Cir.1953).[2]

There is some debate as to whether the court in *Oppen* was applying federal admiralty law or California law. The *Oppen* opinion indicates that the Court found that the result would be the same under both general admiralty law and California law and therefore it declined to decide which applied. *See Oppen*, 501 F.2d at 567 & 568–569.

## IV. IS THERE A FISHERMEN EXCEPTION UNDER NINTH CIRCUIT MARITIME LAW? DOES IT APPLY ONLY IN NEGLIGENCE SUITS AND NOT IN STRICT LIABILITY? DOES IT INCLUDE FISHBROKERS?

*Oppen* and *Carbone* also indicate that the Ninth Circuit applies a fishermen exception to the *Robins* rule. *Oppen*, 501 F.2d at 570; *Carbone*, 209 F.2d at 182. It has been suggested that the Supreme Court did away with this exception in *East River, supra.*

█ In *East River* the Court held that there could be no recovery for solely economic losses caused by a defective product in either negligence or strict liability. 106 S.Ct. at 2304. The Court was influenced by the fact that the plaintiff had the more appropriate remedy of a breach of warranty suit for economic losses. *Id.* at 2303–4. The Court is of the opinion that this ruling has no impact outside of the products liability context.[3] Therefore, the fishermen exception is still valid in the Ninth Circuit.

As to whether the fishermen exception applies in a strict liability suit, the only Ninth Circuit case providing for that was a products liability case (*Emerson G.M. Diesel, Inc. v. Alaskan Enterprise*, 732 F.2d 1468 (9th Cir.1984)) and therefore was overturned by *East River*. Therefore there is no clear authority in this issue.

2. Two recent district court cases have also held that *Robins* applies to general admiralty law in the Ninth Circuit. *See In re Exxon Valdez*, 767 F.Supp. 1509, 1511 (D.Alaska 1991); *Benefiel v. Exxon*, 1990 WL 180503 (C.D.Cal.1990).

3. In addressing this same issue, the Ninth Circuit has said, "Too much should not be made of

The District Court in *Glacier Bay* has held that the fishermen exception does apply to strict liability claims since the purpose of the exception, to protect the favorites of admiralty, is as applicable to strict liability claims as it is to negligence claims. *Glacier Bay*, Order of 7/26/91 p. 12. Given the leanings of the Circuit seen in *Emerson*, the Court finds this reasoning persuasive. Therefore, the Court finds that the fishermen exception applies in strict liability suits.

█ Fishbroker plaintiffs have argued that the fishermen exception should apply to fishbrokers since fishbrokers rely upon the resources of the sea in the same ways as the fishermen, and under California law both groups are subject to the same extensive regulation of their trade and are thereby made interconnected.

All of the Ninth Circuit cases that have addressed this issue have refused to apply it to fishbrokers. Although the State regulations may make brokers and fishermen highly interdependent and subject to similar restrictions, that does not turn the brokers into fishermen. Every party in a commercial transaction is dependent upon those they deal with. This is not a sufficient basis for treating them identically. Particularly here, where the fishermen exception is intended to be a narrow exception carved out for "the favorites of admiralty."

The Court therefore declines to apply the fishermen exception to fishbrokers.

## V. HOW DOES TAPAA AFFECT OTHER GENERAL MARITIME AND STATE LAW REMEDIES FOR DAMAGES CAUSED BY OIL SPILLS? DOES IT PREEMPT, AUTHORIZE, OR ALTER THOSE LAWS?

In further addressing the (c)(3) claims are affected by TAPAA and general mari-

a restraint imposed on the scope of liability for negligence when it has been developed for the purpose of preserving an area within which warranties can function." *Union Oil Co. v. Open*, 501 F.2d 558, 565 (9th Cir.1974).

time law, the Court must look at what the legal substance of those claims is. The plaintiffs are asserting claims for maritime tort and maritime negligence, state law statutory strict liability (Cal. Harb. & Nav. Code §§ 293 and 294), state common law negligence, and state common law strict liability.

■ All of these claims are permitted by TAPAA. § 1653(c)(3) states that "the unpaid portion of any claim may be asserted and adjudicated under other applicable Federal of State law." § 1653(c)(9) provides that it "shall not be interpreted to preempt the field of strict liability or to preclude any state from imposing additional requirements." Thus, it is clear that Congress intended to allow recovery of damages beyond those provided for under TAPAA under either federal or state laws or both. It is also clear that Congress did not intend for the statute to alter these remedies.[4]

## VI. HOW DOES GENERAL MARITIME LAW AFFECT STATE LAW REMEDIES THAT GO BEYOND *ROBINS*?

### A. What the State Law Provides For

The first question is whether the state law remedies do provide for non*Robins* recovery. It is clear that California has overturned *Robins* as to all common law claims. See *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 413, 598 P.2d 60, 66 (Cal.1979). It is also clear that Cal.Harb. & Nav.Code § 294 provides for the recovery of solely economic losses. *See* § 294(g)(1). Yet, § 293 does not.

■ § 293 provides for recovery for damage to natural resources, but this recovery is only in favor of the State. The statute imposes liability upon an owner/operator "for any property damage incurred by the state or by any county, city or district, or by any person, within the state, and for damage or injury to the natural resources of the state, including, but not limited to, marine and wildlife resources."

§ 293. After being so specific about *who* can recover for *property damages*, the statute then fails to specify *who* can collect for the injury to *natural resources.* The logical interpretation of the statute is that a private party can collect only for damage to its own property and that only the State, the party with a proprietary interest in the natural resources, can recovery for damage to them.

Therefore, there is no recovery for solely economic claims asserted under § 293 and these claims shall be dismissed.

### B. Is the State Law Preempted by General Admiralty Law?

As to the common law and § 294 claims, for which there is non*Robins* recovery, the Court proceeds to the second question, which is whether that is permissible under federal law. The question is posed whether state law that does not include *Robins,* is preempted by general admiralty law.

"[A] State may modify or supplement maritime law ... 'provided that the state action "does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations." ' " *Askew,* 93 S.Ct. at 1598–9 (quoting *Just v. Chambers,* 312 U.S. 383, 668, 61 S.Ct. 687, 692, 85 L.Ed. 903 (1941)).

"[T]he general rule on preemption in admiralty is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system. *Pacific Merchant Shipping Association v. Aubry,* 918 F.2d 1409, 1422 (9th Cir.1990) (emphasis in original). While "states' supplementation of admiralty law necessarily creates some discord in that law," the state law must "un-

---

**4.** In *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 93 S.Ct. 1590, 1595, 36 L.Ed.2d 280 (1973), *rhg. den.,* 412 U.S. 933, 93 S.Ct. 2746, 37 L.Ed.2d 162 (1973), the Supreme Court has upheld similar state laws that were authorized by a similar provision in the federal Water Quality Improvement Act. Since nothing in the state law remedies conflicts with TAPAA, they are not preempted by TAPAA.

duly disrupt" admiralty to be preempted. *Id.* at 1424.

■ In analyzing this issue, the Court may consider whether the maritime law in the area is developed or does not require a uniform rule on the issue, *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 480–481, 3 L.Ed.2d 368 (1959); *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960), and how the significance of the local state interest compares to the maritime interest at stake. *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 892, 6 L.Ed.2d 56 (1961), *rhrg. denied,* 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852 (1961); *East River*, 106 S.Ct. at 2299 n. 2.

In *Askew* the Supreme Court held that regulation of sea-to-shore pollution was within the state's police powers and that even though Congress had legislated in the area, state regulation was permissible absent a clear conflict with federal law. 93 S.Ct. at 1600–1601. The state laws here are comparable to those in *Askew.* (c)(9) of the statute also indicates that such regulation would be within the state's police powers and would not interfere with the uniformity of maritime law.

Since there is no *Robins* under TAPAA, the goal of uniformity would be promoted if other non*Robins* law applied to trans-Alaska oil.

Both the Supreme Court and the Ninth Circuit have recognized that California has a strong local interest in regulating pollution within its borders, particularly oil spills affecting its coastal waters. *Askew, supra; Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 488 (9th Cir.1984). The Ninth Circuit has also pointed out that "[t]he subject matter of environmental regulation .. has long been regarded by the [Supreme] Court as particularly suited to local regulation." *Id.*

■ It has been suggested that the State has a compelling interest in regulating pollution within its borders, but that this interest does not extend to permitting recovery to claimants with solely economic damages, because they are not "actually injured." The relevant question is whether the State has a compelling interest in regulating the matter, and not whether it has a compelling interest in enforcing each particular regulation that it establish. Once the court determines that the state's interest overrides the federal interest in uniformity, then it is within the state's discretion to determine how it will protect that interest.

Ninth Circuit precedents in which state law was held to be preempted are all distinguishable or their authority is questionable.

*Churchill v. The F/V Fjord*, 857 F.2d 571, 576 (9th Cir.1988), *cert. den.,* — U.S. ——, 110 S.Ct. 3273, 111 L.Ed.2d 783 (1990), held that state law that provided recovery for damages resulting from the collision of two vessels on navigable waters was preempted because it disturbed the uniformity of duties and liabilities imposed upon vessel owners. Yet, the Court relied upon Supreme Court precedents, *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), and *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 that the Supreme Court has said "have been limited to their facts, *viz.,* to suits relating to the relationship of vessels, plying the high seas and our navigable waters, and to their crews." *Askew*, 93 S.Ct. at 1601. The Supreme Court has gone on to say, "we decline to move the *Jensen* line shoreward to oust state law from any situations involving shoreside injuries by ships on navigable waters." *Id.*

Regardless of which side of the line the statute in *Churchhill* is on, the Supreme Court's position is clear. State laws providing for recovery for shoreside damage from oil spills are permissible, unless they conflict with a specific federal law. *Askew*, 93 S.Ct. at 1600–01.

In *Genetics International v. Cormorant Bulk Carriers, Inc.*, 877 F.2d 806 (9th Cir. 1989), the Court held that recovery for damages to goods shipped by sea is governed solely by admiralty law and that state law is automatically and completely preempted. *Id.* at 808. The basis for this

ruling is in question. Furthermore, the case is clearly distinguishable on the grounds laid out in *Askew,* and the fact that the Court interpreted the federal law as governing the issue entirely, thus making the state law conflicting and unnecessary.

*Evich v. Morris,* 819 F.2d 256 (9th Cir. 1987), *cert. den.,* 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987), also is inapplicable to this case. In *Evich* the Court held that a state survival action was preempted by federal maritime law on the grounds that the Circuit had previously held, in *Nelson v. U.S.,* 639 F.2d 469 (9th Cir.1980), that a state wrongful death action was preempted. *Evich,* 819 F.2d at 257–8. The *Evich* court said that this was based upon the "need for uniformity." *Id.* Yet, in the underlying case, *Nelson,* the Court actually decided to create a new federal maritime cause of action instead of applying the state common law. 639 F.2d at 473.

In this case the Court would not be creating a new federal common law cause of action to replace the preempted state law. Moreover, the Supreme Court has held that both state wrongful death and survival actions can be applied in admiralty whether they supplement or modify the existing maritime law. *Just v. Chambers,* 61 S.Ct. at 693.

The Court also recognizes two recent cases from the Alaska District Court both holding as follows: 1) that there is no *Robins* under TAPAA; 2) that state law strict liability recoveries are allowable since they do not conflict with general admiralty law given that TAPAA is part of that law; 3) but that state law that provides for recovery unlimited by *Robins* is preempted because it is inconsistent with general maritime law.[5] *In re Exxon Valdez,* Order No. 38; *In re Glacier Bay,* Order of 7/26/91.

The Court is concerned that having different standards under TAPAA and non-TAPAA could create a serious threat to the uniformity and harmony of maritime law. If recovery under TAPAA is non*Robins* and recovery beyond TAPAA is limited by *Robins* then in a spill with damages that exceed $100 million, the ability to recover for economic damages and the extent of liability for those damages will depend upon tactical maneuvering. Since parties with solely economic damages can recovery only under TAPAA, they will want to persuade plaintiffs who could alternatively recover under other laws, to use those other laws and save the TAPAA $100 million for their solely economic damages.

Thus, two identical spills could result in vastly different recovery and liability depending upon how the claims were arranged. This is strikingly pointed out by the *Exxon Valdez* Court when it urged the government plaintiffs to refrain from using TAPAA since they had alternative statutory remedies so that the economic loss claimants could recover as much as possible. *See Exxon Valdez,* Order No. 38, pp. 17–18.

Using TAPAA as a new benchmark for federal admiralty law does not conflict with § 1653(c)(9). (c)(9) merely says that TAPAA shall not preempt the field, or "preclude any State from imposing additional requirements." The section does not say that it shall have no effect upon requirements under *federal maritime law.* It also says that it will not prevent states from *adding limitations,* not that it will not allow states to do away with limitations.

In summary, the Court holds that state law claims that go beyond *Robins* are not preempted because any federal interest in uniformity in this area is outweighed by the compelling state interest, there is no

---

5. These Courts have also held that to the extent of the TAPAA imposed liabilities against the TAPAA defendants, state law that provided for non*Robins* recovery would not be preempted. Thus, if a TAPAA plaintiff proceeded under state law instead of, or in addition to TAPAA, it could get the same recovery it would have gotten under TAPAA.

In *Glacier Bay,* plaintiffs with solely economic damages settled their TAPAA claims with the Fund and then pursued the owner/operators under state law for the alleged shortfall in recovery. The owner/operators apparently had not paid up to the $14 million maximum they would have been liable for under TAPAA.

actual conflict with federal admiralty law since that law includes TAPAA, and the goal of uniformity is served by allowing for non*Robins* and strict liability state remedies.

## VII. HOW DOES GENERAL MARITIME LAW AFFECT STATE LAW REMEDIES THAT PROVIDE FOR COMMON LAW STRICT LIABILITY?

In *State Fish* the Seventh Claim for relief is a claim for strict liability for transporting ultrahazardous materials. This claim has been challenged on the grounds that the doctrine of strict liability for ultrahazardous activity is not recognized in general maritime law.

■ It appears that there is no authority for this doctrine as part of federal maritime law. *See EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715, 722 n. 13 (1st Cir.1984); *Petition of Oskar Tiedemann and Co.*, 179 F.Supp. 227, 238 (D.Del.1959); *Actiesselskabet Ingrid v. Central R. Co.*, 216 F. 72, 78 (2nd Cir.1914).

Yet this doctrine is recognized under California state law. For the same reasons as discussed above with regards to non*Robins* state law, the Court holds that this state law doctrine supplements federal law. The state has a compelling interest in regulating this activity and uniformity is served since all the applicable federal statutes place strict liability upon those transporting the oil. (*See* Water and Environmental Quality Improvement Act of 1970, TAPAA, and OPA.)

## VIII. ARE EACH OF BP ENTITIES PROPER TAPAA DEFENDANTS?

■ TAPAA creates a cause of action against the "owner" and the "operator" of the vessel. § 1653(c)(1). Plaintiffs have alleged in their complaint that all of the BP entities were the owner/operator within the meaning of the § 1653. BP Oil Supply Company is the owner of the oil. BP Oil Shipping Co., U.S.A. time chartered the

vessel. BP America, Inc. was not involved in any way.

BP argues that as the owner of the oil and time charterer of the vessel it is neither the "owner" or "operator" of the vessel. The regulations define "operator" of a vessel as "the person operating or chartering by demise." 43 C.F.R. § 29.1(k)(2).

It is possible for the plaintiffs to establish that the charter by BP makes it an "operator" under the statute. Therefore, the allegations are sufficient to overcome this 12(c) motion.

■ BP has also suggested that it can not be liable under TAPAA because its TAPAA imposed responsibilities are limited to the 5 cents per barrel it pays into the Fund. BP is incorrect. This conflicts directly with the *Glacier Bay* holding that the TAPAA scheme is for the Fund and the owner/operator to pay out (up to $100 million) without restrictions, and for the negligent party, whoever it is, to pay these parties back in full. Thus, BP could be liable under (c)(1) as an owner/operator or pursuant to the (c)(8) subrogation provision.

## IX. IS GOLDEN WEST A PROPER DEFENDANT UNDER CALIFORNIA HARB. & NAV.CODE § 294?

§ 294 provides that the certain persons defined therein as "responsible" for an oil spill shall be strictly liable. *See* § 294(a) and (g)(7).[6] In order to be a "responsible person" under § 294, one must be the owner or transporter of the oil, or the owner or operator of the "well, undersea site, facility, oil rig, oil platform, vessel, or pipeline which is the source of the [oil]." § 294(g)(7).

■ The *Slaven* and *State Fish* complaints allege that Golden West was the owner/operator of the marine terminal sea berth. The *Rados* third party complaint alleges that Golden West was "lessee and operator of a marine oil pipeline facility ... [which] consists in relevant part of an ap-

---

**6.** By mistake, the *Slaven* and *State Fish* plaintiffs cited § 293 instead of § 294. § 293 provides for strict liability for the "owner or opera-

tor" of the vessel. At oral argument, plaintiffs were granted leave pursuant to Rule 15 to amend their complaints to cure this error.

proach area ...". (BP's Third Party Complaint ¶ 4). All the complaints also allege that the oil spilled out of the vessel that was owned by ATTRANSCO.

On the basis of these allegations, it may be possible for Golden West to be a "responsible person" on account of its facility being the "source" of the oil. BP contends that if the spill occurred "at" the facility, or "within the confines of the facility" of "while the tanker was being maneuvered in Golden West's sea berth," that the facility would be the "source" within the meaning of (g)(7). Golden West argues that "source" means that the oil initially was held by that structure.

 The Court finds that the meaning of the word "source" in the statute is sufficiently unclear so as to counsel against judgment on the pleadings at this time.[7]

Furthermore, it appears that the plaintiffs would like to proceed on the theory that Golden West was the "operator" of the vessel and that Golden West has offered to allow BP to amend its complaint to include such an allegation. Therefore, the Court hereby grants the plaintiffs in *Slaven* and *State Fish* and BP leave pursuant to Rule 15 to amend their complaints to add an allegation that Golden West was the operator of the vessel and therefore "responsible" under § 294.

## X. ARE THE ALLEGATION OF PHYSICAL INJURY BY THE PLAINTIFFS IN THE *Slaven* THIRD AMENDED COMPLAINT SO *de minimis* THAT THEY SHOULD NOT SAVE THE CLAIMS FROM DISMISSAL? ARE THE ALLEGATIONS SUFFICIENT TO DEFEAT A 12(c) MOTION?

 To the extent that there is a physical injury requirement under the general maritime law claims made here, it has been suggested that those damages must be substantial and the economic losses must arise from those physical damages. While there is some doubt as to whether there is

such a requirement at all, it is not determinative at this point. In their Third Amended Complaint the *Slaven* plaintiffs clearly have alleged sufficient damages to meet this burden. As long as there is some chance of proving facts sufficient to carry the claims, the plaintiffs are entitled to go further with their claims.

## XI. DOES TAPAA PROVIDE A NEGLIGENCE CAUSE OF ACTION ON BEHALF OF THE VICTIMS OF THE SPILL?

 Plaintiffs have alleged a negligence cause of action under 43 U.S.C. § 1653(c)(8). The (c)(8) subrogation provision does not create or authorize a cause of action. It merely *transfers* a preexisting chose in action from victim to the Fund and the owner/operator after those parties have paid the victim pursuant to (c)(1).

Therefore, all of the TAPAA negligence claims are hereby dismissed.

## XII. RULINGS ON THE INDIVIDUAL MOTIONS

In accordance with rulings made above, the Court rules on the individual motions.

The Fund's Motion for judgment on the pleadings in CV 90–722 and in CV 91–334 is denied.

BP's Motions for judgment on the pleadings, ATTRANSCO's Motion to join, and Golden West's Motions for dismissal and judgment on the pleadings are disposed of as follows:

In CV 90–722 judgment is granted as to Counts II and III in their entirety, as to Count IV as asserted by Nitta d/b/a the Seacliff Motel, Heinz Pet Products Company, and all other plaintiffs who are not commercial fishermen and did not suffer physical injury to their persons or property, and as to Count V as asserted by all plaintiffs who did not suffer physical injury to the persons or property. In all other respects the motions are denied.

---

**7.** The Court also finds that complaint need not provide additional descriptive detail about the facility in order to state a viable claim under the statute. Therefore, the complaint need not state

that "exploration for, or extraction, recovery, processing or storage" of oil occurs at the facility in order to survive a motion for judgment on the pleadings. *See* § 294(a).

In CV 90–733 judgment is granted as to the First Cause of Action as asserted by all plaintiffs who are not commercial fishermen and did not suffer physical injury to their persons or property; in all respects the motions are denied.

In CV 91–334, judgment is granted as to the Second and Third Claims in their entirety, as to the Fourth Claim as asserted by all plaintiffs who are not commercial fishermen and did not suffer physical injury to their persons or property, and as to the Fifth Claim as asserted by all plaintiffs who did not suffer physical injury to the persons or property; in all respects the motions are denied.

In CV 91–515, the motions are denied.