KODIAK ISLAND BOROUGH, City of Seward, City of Cordova, City of Old Harbor, City of Ouzinkie, City of Port Lions, and City of Larsen Bay, Appellants,

v.

EXXON CORPORATION and Exxon Shipping Corporation, Appellees.

No. S–7581.

Supreme Court of Alaska.

Nov. 22, 1999.

Matthew D. Jamin, Jamin Ebell Bolger & Gentry, Kodiak, Lloyd B. Miller, Sonosky Chambers Sachse Miller & Munson, Anchorage, and N. Robert Stoll, Stoll Stoll Berne Lokting & Shlachter, P.C., Portland, Oregon, for Appellants.

Douglas J. Serdahely, Bogle & Gates, P.L.L.C., Anchorage, John F. Clough III, Clough & Associates, P.C., Juneau, and Charles P. Diamond, O'Melveny & Myers, Los Angeles, California, for Appellees.

Before BRYNER, Justice, RABINOWITZ, Senior Justice, pro tem,* HUNT, GREENE, and ZERVOS, Justices, pro tem.**

## OPINION

BRYNER, Justice.

This case arises from the EXXON VALDEZ oil spill of March 1989. In response to the discharge of nearly eleven million gallons of crude oil into Prince William Sound, sever-

---

\* Sitting by assignment made pursuant to article IV, section 11 of the Alaska Constitution.

\*\* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

al municipalities were forced to divert employee time and municipal services to a massive cleanup operation. They later filed suit against Exxon to recover the value of these diverted services under an Alaska statute imposing strict liability for the discharge of hazardous substances. The trial court granted summary judgment to Exxon, concluding that the statute did not permit recovery of damages for the municipalities' diverted-services claims. Because we conclude that Alaska law does permit recovery for these diverted services, we reverse.

## I. FACTS AND PROCEEDINGS

On March 24, 1989, the tanker EXXON VALDEZ ran aground near Bligh Reef, spilling nearly eleven million gallons of crude oil into Prince William Sound. In response, Kodiak Island Borough and the cities of Seward, Cordova, Old Harbor, Ouzinkie, Port Lions, and Larsen Bay (collectively, the Cities) were forced to participate in a massive cleanup operation. Municipal officials and employees devoted significant time to tracking oil flow; monitoring shoreline; acquiring oil containment equipment; meeting with Exxon, governmental representatives, and experts about the oil spill and cleanup; and booming off and cleaning key spawning areas on city-owned tidelands. Because the Cities' employees were engaged in these activities, they were unable to provide ordinary services to their residents.

The Cities sued Exxon Corporation, which owned the spilled oil, and its maritime subsidiary, Exxon Shipping Corporation, which owned the EXXON VALDEZ (collectively, Exxon). Relying on AS 46.03.822(a), which imposes strict liability for harm caused by the release of hazardous substances, the Cities claimed damages for the costs of municipal services diverted as a result of the spill. These diverted-services claims included the value of ordinary municipal services that the spill prevented the Cities from providing their residents and the costs of extraordinary services necessitated by the spill.[1]

The superior court established as a matter of law that the oil spill violated the statutory prohibition against release of hazardous substances, that no defenses specified in the hazardous substances statute applied to Exxon, and that Exxon was therefore strictly liable under the statute for "all compensable damages" that the Cities "proved at trial to have been proximately caused by the spill."[2]

Exxon then moved for summary judgment, contending that the Cities' diverted-services claims were not compensable under the hazardous substances statute. The superior court agreed and granted summary judgment in Exxon's favor.

The Cities appeal.

## II. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment de novo,[3] determining whether the record shows a genuine issue of material fact and whether the moving party is entitled to judgment on the law applicable to the established facts.[4] For purposes of determining what facts are established, we must draw all reasonable inferences in favor of the non-moving party.[5] But in answering questions of law, we apply our independent judgment and adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[6]

---

1. AS 46.03.822(a) provides for recovery of various *direct and indirect damages resulting from an oil spill. See infra* note 8. Under this statute, recoverable indirect costs encompass
   the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service, that are incurred by the state, a municipality, or a village, and the costs of projects or activities *that are delayed or lost because of the efforts of the state, the municipality, or the village....*
   *Id.* In this opinion, we use the term "diverted-services claims" to refer to claims for recovery of such indirect costs.

2. *See* AS 46.03.822(a).

3. *See Reeves v. Alyeska Pipeline Serv. Co.,* 926 P.2d 1130, 1134 (Alaska 1996).

4. *See Nielson v. Benton,* 903 P.2d 1049, 1051–52 (Alaska 1995).

5. *See id.*

6. *Id.*

We may affirm a grant of summary judgment on any legal ground that supports the trial court's ruling.[7]

### B. *The Parties' Arguments*

Alaska Statute 46.03.822(a) provides that certain persons may be held strictly liable for various damages caused by an unpermitted release of a hazardous substance.[8] Alaska Statutes 46.03.822(a), AS 46.03.822(k),[9] and AS 46.03.824[10] together define the scope of recoverable damages.

The Cities argue that the superior court erred in concluding that their diverted-services claims are not "damages" within the meaning of these statutes. Exxon responds that the "free public services doctrine" bars the Cities' diverted-services claims and that the superior court therefore correctly interpreted the statutes. Exxon also argues that the Cities waived their rights to these damages and that they lack standing to assert

their claims. Last, Exxon argues that federal maritime law preempts the Cities' claims. We consider each argument below.

### C. *Alaska's Hazardous Substances Statutes Authorize Recovery for Diverted Services.*

1. *Assuming that the free public services doctrine applies as a matter of common law, Alaska's hazardous substances statutes abrogate the doctrine to the extent that it affects municipal recovery for spill-related damages.*

Exxon argues that the free public services doctrine bars the Cities' claims for costs they incurred in responding to the oil spill. This common-law doctrine provides that the public must bear the costs of providing emergency public services, thus relieving individual tortfeasors of liability.[11] Although

---

**7.** *See State v. Teller Native Corp.,* 904 P.2d 847, 849 (Alaska 1995).

**8.** AS 46.03.822(a) provides, in relevant part:

(a) Notwithstanding any other provision or rule of law and subject only to [various defenses not pertinent to this case], the following persons are strictly liable, jointly and severally, for damages, for the costs of response, containment, removal, or remedial action incurred by the state, a municipality, or a village, and for the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service, that are incurred by the state, a municipality, or a village, and the costs of projects or activities that are delayed or lost because of the efforts of the state, the municipality, or the village, resulting from an unpermitted release of a hazardous substance or, with respect to response costs, the substantial threat of an unpermitted release of a hazardous substance:

(1) the owner of, and the person having control over, the hazardous substance at the time of the release or threatened release; this paragraph does not apply to a consumer product in consumer use;

(2) the owner and the operator of a vessel or facility, from which there is a release, or a threatened release that causes the incurrence of response costs, of a hazardous substance[.]

**9.** AS 46.03.822(k) provides:

(k) In this section, "damages" has the meaning given in AS 46.03.824 and includes damage to persons or to public or private property, [and] damage to the natural resources of the state or a municipality. . . .

**10.** AS 46.03.824 provides:

Damages include but are not limited to injury to or loss of persons or property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit.

**11.** *See City of Flagstaff v. Atchison, Topeka and Santa Fe R.R. Co.,* 719 F.2d 322, 323–24 (9th Cir.1983) (first prominent decision on the free public services doctrine); *see also District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1079–80 (D.C.Cir.1984) (holding that the doctrine barred the city from recovering the cost of emergency services and cleanup associated with an airline crash from allegedly negligent airline); *County of San Luis Obispo v. Abalone Alliance,* 178 Cal.App.3d 848, 223 Cal.Rptr. 846, 850–51 (1986) (ruling that the county could not recover from allegedly trespassing protestors the cost of additional police to protect nuclear power plant construction site); *Austin v. City of Buffalo,* 182 A.D.2d 1143, 586 N.Y.S.2d 841, 842 (1992) (concluding that the city could not recover from tortious fire-starter the cost of damaged firefighting equipment and injury to fire fighters); *City of Pittsburgh v. Equitable Gas Co.,* 98 Pa.Cmwlth. 523, 512 A.2d 83, 84 (1986) (holding that the city could not recover from gas company the cost of police force needed to isolate natural-gas fires). *But see* David C. McIntyre, Note, *Tortfeasor Liability for Disaster Response Costs: Accounting for the True Cost of Accidents,* 55 Fordham L.Rev. 1001, 1004–07 (1987) (advocating a contrary common-law rule for extraordinary emergency services since local governments rarely budget to absorb these costs).

we have had no occasion to consider the doctrine, we assume for purposes of this appeal that it applies unless abrogated by statute.

The pertinent question thus becomes whether the legislature has in fact abrogated the doctrine insofar as it might bar municipal claims for costs of diverted services resulting from the EXXON VALDEZ oil spill. In our judgment, the answer lies in the text of AS 46.03.822. Subsection .822(a) subjects owners and shippers of oil to strict liability for various damages caused by an unpermitted release of oil.[12] Specifically, the statute imposes liability

> for damages, for the costs of response, containment, removal, or remedial action incurred by the state, a municipality, or a village, and for the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service, that are incurred by the state, a municipality, or a village, and the costs of projects or activities that are delayed or lost because of the efforts of the state, the municipality, or the village.... [13]

Subsection (k) of the same statute adds: "In this section, 'damages' has the meaning given in AS 46.03.824 and includes damage to persons or to public or private property, [and] damage to the natural resources of the state or a municipality...." [14] And AS 46.03.824 broadly defines damages to include any "injury to or loss of persons or property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit."

■ The breadth of this language and the statute's specific provision for recovery of costs incurred by "the state, a municipality, or a village," [15] strongly suggest a legislative intent to permit compensation for governmental services including those services rendered non-compensable at common law by the free public services doctrine. Moreover, AS 46.03.822(a) expressly states that the imposition of strict liability for release of hazardous substances applies "[n]otwithstanding any other provision or rule of law." This language evinces the legislature's intent to abrogate all otherwise applicable common-law doctrines, including the doctrine of free public services, except insofar as they are expressed in the statute itself.

Again assuming that the free public services doctrine is part of Alaska's common law, we reject Exxon's contention that the doctrine restricts the Cities' compensable damages in the factual context of this case. To define the scope of recoverable damages, we must examine Alaska's hazardous substances statutes.

## 2. The Cities' diverted-services claims are compensable under Alaska's hazardous substances statutes.

■ We next consider whether the superior court correctly interpreted and applied the damages provisions of Alaska's hazardous substances statutes. When we engage in statutory construction, we must, whenever possible, "interpret[ ] each part or section of a statute with every other part or section, so as to create a harmonious whole." [16] We must also presume "that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous." [17] Furthermore, we generally presume that an amendment to an unambiguous statute indicates a "substantive change in the law." [18] But if the original version of the statute is ambiguous, we may regard a subsequent change as a legislative interpretation or clarification.[19]

12. See AS 46.03.822(a) (quoted in supra note 8).

13. AS 46.03.822(a).

14. AS 43.03.822(k).

15. AS 46.03.822(a).

16. Rydwell v. Anchorage Sch. Dist., 864 P.2d 526, 528 (Alaska 1993).

17. Id. at 530–31.

18. City of Anchorage v. Thomas, 624 P.2d 271, 273 (Alaska 1981).

19. See id.

### a. *Legislative history of AS 46.03.822*

Alaska's hazardous substances provisions, including AS 46.03.822, were added to the state Environmental Conservation Act in 1972.[20] Except for a minor, irrelevant modification, the original version of AS 46.03.822 remained in effect when the EXXON VALDEZ spill occurred; it provided, in relevant part:

> To the extent not otherwise preempted by federal law, a person owning or having control over a hazardous substance which enters in or upon the waters, surface or subsurface lands of the state is strictly liable, without regard to fault, for the damages to persons or property, public or private, caused by the entry.[21]

Though this provision did not specifically define "damages," a companion section of the Environmental Conservation statute, AS 46.03.824, provided that "[d]amages include but are not limited to injury to or loss of persons or property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit." [22] Alaska Statute 46.03.826(2) further specified that "'economic benefit' means a benefit measurable in economic terms." [23] And AS 46.03.900 defined "person" to mean "any individual, public or private corporation, political subdivision, government agency, municipality, industry, copartnership, association, firm, trust, estate, or any other entity whatsoever." [24]

When read together, these provisions encompassed an exceedingly broad but rather loosely described range of recovery for spill-related harm to virtually any entity—private or public—injured by the release of hazardous substances within Alaska. Soon after the EXXON VALDEZ spill, questions arose as to the precise scope of damages these hazardous substances provisions allowed.

In 1989 the legislature rewrote and reorganized AS 46.03.822, designating its original strict-liability language as subsection .822(a) and amending the subsection to read:

> (a) *Notwithstanding any other provision or rule of law* ..., the following persons are strictly liable, *jointly and severally,* for damages to persons or property, whether public or private, *including damage to the natural resources of the state or municipality, and for the cost of response, containment, removal, or remedial action incurred by the state or municipality,* resulting from unpermitted release of hazardous substance or, with respect to response costs, the substantial threat of an unpermitted release of a hazardous substance[.][25]

The newly enacted language, which the legislature applied retroactively,[26] provided for joint and several liability and made clear that the public could recover the full costs of responses for spills.[27] When introduced in the legislature, this amendment was likened to the federal Comprehensive Environmental Recovery, Compensation, and Liability Act (CERCLA) [28]—the basic premise of both the federal and state legislation being that the responsible parties, not the general public, would pay for cleanup of hazardous substance spills.[29]

**20.** *See* Ch. 122, § 1, SLA 1972.

**21.** Former AS 46.03.822, as amended by Ch. 220, § 13, SLA 1976 (omitting various defenses not pertinent here).

**22.** Former AS 46.03.824, as amended by Ch. 122, § 1, SLA 1972.

**23.** *Id.*

**24.** Former 46.03.900, as amended by Ch. 120, § 3, SLA 1971. This provision was originally enacted as AS 46.03.900(13). AS 46.03.900 was later reorganized; the current provision is AS 46.03.900(17).

**25.** *See* Ch. 39, § 2, SLA 1989 (emphasis added to identify relevant substantive changes).

**26.** *See id.* § 8.

**27.** *See* 1989 House Journal 46–49 (Letter from Steve Cowper, Governor, to Sam Cotten, Speaker of the House, January 9, 1989).

**28.** 42 U.S.C. §§ 9601–9675 (1995 & Supp.1998).

**29.** *See* 1989 House Journal 46–49 (Letter from Steve Cowper, Governor, to Sam Cotten, Speaker of the House, January 9, 1989); *see also* Letter from Steve Cowper, Governor, to Jan Faiks, Senator (May 2, 1989) ("The people of the state must be assured that they will not have to absorb the costs of cleanup from hazardous substance spills.").

The legislature returned to AS 46.03.822 in 1991, amending the statute twice. The first amendment, which also applied retroactively to the date of the EXXON VALDEZ spill,[30] added villages to the entities allowed to recover under the statute and again expanded compensable oil-spill damages by including:

> the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service, that are incurred by the state, a municipality, or a village, and the costs of projects or activities that are delayed or lost because of the efforts of the state, the municipality, or the village....[31]

The second 1991 amendment moved some of the damages language originally included in subsection .822(a)—specifically, the subsection's reference to damage "to persons or property, whether public or private, including damage to the natural resources of the state or municipality"—into a new subsection, .822(k), which set out a definition of damages governing section .822 as a whole:

> (k) In this section, "damages" include damage to persons or to public or private property, damage to the natural resources of the state or a municipality....[32]

After the 1991 amendments, three distinct provisions of the hazardous substances statutes addressed damages. First, the doubly amended subsection .822(a) provided:

> (a) Notwithstanding any other provision or rule of law ..., the following persons are strictly liable, jointly and severally, for damages, for the cost of response, containment, removal, remedial action incurred by the state, a municipality, or a village, and for the additional costs of a function or service, including administrative expenses for the incremental costs of providing the

function or service, that are incurred by the state, a municipality, or a village, and the costs of projects or activities that are delayed or lost because of the efforts of the state, the municipality, or the village, resulting from unpermitted release of hazardous substance, or with respect to response costs, the substantial threat of an unpermitted release of a hazardous substance[.][33]

Second, newly enacted subsection (k) contained the provisions already quoted above. And, third, AS 46.03.824 continued to state, as it had since the original enactment of the hazardous substances provisions in 1972: "Damages include but are not limited to injury to or loss of persons or property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit."

By shifting language from subsection .822(a) into the definition of damages in subsection .822(k), the legislature created some confusion as to whether the original definition of damages set out in section .824 continued to apply to section .822. The legislature resolved this confusion in 1992 by amending subsection .822(k) to expressly incorporate the general definition of damages set out in section .824:

> (k) In this section, "damages" has the meaning given in AS 46.03.824 and includes damage to persons or to public or private property, damage to the natural resources of the state or a municipality....[34]

Since this 1992 amendment of subsection (k), the definitions of damages set out in sections .822 and .824 have remained unchanged.

**30.** *See* Ch. 83, § 22, SLA 1991.

**31.** *See id.* § 9.

**32.** *See* Ch. 92, §§ 1 & 3, SLA 1991. The language shifted from subsection (a) was supplemented by new language—not quoted in the text because it has no relevance—which holds shippers and owners of spilled oil liable for damages caused by spill cleanup contractors. *See id.* §§ 1 & 3. The added language holding owners and

shippers liable for acts of response-action contractors was necessary because, by separate provisions of the same amendment, the legislature exempted the contractors themselves from cleanup liability. *See id.* §§ 4–8.

**33.** AS 46.03.822(a).

**34.** Former AS 46.03.822(k), as amended by Ch. 83, § 5, SLA 1992; *see also supra* note 32 (discussing 1991 amendments).

b. *Neither the text nor the history of the hazardous substances statutes supports restricting the Cities' diverted-services claims.*

In rejecting the Cities' diverted-services claims, the superior court ruled that only a narrow portion of the damages provisions in the hazardous substances statutes applied to municipalities and villages. Noting that the language in subsection .822(a) dealing with "the cost of response" and "other costs" expressly extended to "municipalities and villages," the superior court reasoned that the legislature did not intend the subsection's other damages language, or damages described in subsection .822(k) and section .824, to apply to the Cities.

But nothing in subsection .822(a) or elsewhere indicates that the subsection's express "cost" language exclusively defines municipal damages. Subsection .822(a) broadly imposes joint and several strict liability for all spill-related "damages." Although this general damages clause does not explicitly mention municipalities, its scope must be gauged by reference to subsection .822(k) and section .824. These provisions do specifically contemplate municipal recovery of "damages." Subsection .822(k) expressly defines damages "[i]n this section"—that is, in section .822 as a whole—to include "damage to persons or to public or private property, [and] damage to the natural resources of the state *or a municipality*." [35] The subsection also explicitly incorporates the definition of damages contained in section .824. [36] Strikingly broad, that latter definition includes "injury to ... persons." [37] And AS 46.03.900 comprehensively defines "person" to mean "any individual, public or private corporation, political subdivision, government agency, *municipality*, industry, copartnership, association, firm, trust, estate, or any other entity whatsoever." [38]

Nor does the history of the hazardous substances statutes indicate that the legislature intended to preclude municipal diverted-services claims from being asserted under these general damages provisions. As we have seen, although sections .822 and .824 originally defined damages in general terms, the definition was remarkably broad from the outset and has always encompassed recovery by "any ... entity whatsoever." [39] In amending the damages provisions after the EXXON VALDEZ disaster, the legislature showed little inclination to restrict the overall scope of permissible recovery. To the contrary, both the progressive expansion of compensable harms covered by the post-spill amendments and the comprehensive nature of the damages provisions as ultimately configured strongly suggest that the legislature acted not to narrow compensation or limit liability but to clarify and confirm the broad scope of the original provisions by describing concrete examples of allowable damages.

Nothing in the wording or legislative history of the hazardous substances statutes hints that subsection .822(a)'s more recently added examples of compensable harms were meant to exclude other claims for different spill-related harms or to constrict the universe of future recovery—for municipalities or for any other prospective claimants. While the specific costs listed in subsection .822(a) provide useful examples of harms that the legislature clearly considered compensable, they cannot properly be construed to define the outer limits of the Cities' right to assert their diverted-services claims. Accordingly, we conclude that the superior court erred in ruling that the Cities were only entitled to recover costs that subsection .822(a) specifically identifies as recoverable by municipalities.

Moreover, we note that the superior court construed subsection .822(a)'s costs provisions narrowly. For example, the court ruled that subsection .822(a)'s "cost of response" clause only covers out-of-pocket costs for extraordinary governmental services and that its provision for "additional costs" could only include costs of services not

---

**35.** AS 46.03.822(k) (emphasis added).

**36.** *Id.*

**37.** AS 46.03.824.

**38.** AS 46.03.900(17) (emphasis added).

**39.** AS 46.03.824.

already budgeted. And because the Cities had not specifically pressed for damages under subsection .822(a)'s "costs of projects or activities delayed or lost" language, the court declined to consider whether their diverted-services claims were compensable under that provision.

The Cities contend that subsection .822(a)'s costs clauses should be read more broadly. They argue, for instance, that the "costs of response" clause should be read to encompass all costs of municipal services—ordinary and extraordinary, budgeted and unbudgeted, and emergency and non-emergency—incurred "in response" to the spill. They also argue that "additional" costs should be understood to include costs of response in addition to the direct costs of containment, removal, and remedial action.

Though our conclusion that the court erred in too narrowly interpreting the general damages provisions of sections .822 and .824 as a whole makes it unnecessary to decide the Cities' specific contentions concerning the scope of subsection .822(a)'s costs clauses, we think it appropriate to note our agreement with the Cities' basic position.

The Cities' claim is relatively straightforward: they seek to recover all "damages" allowable under the hazardous substances statutes that they ultimately are capable of proving. We have interpreted the hazardous substances statutes to encompass a broad range of potential recovery and have construed subsection .822(a)'s statement of specific compensable costs to be exemplary and inclusive, not definitive or exclusive. On remand, the Cities certainly must be held to their burden of proving actual damages within the meaning of sections .822 and .824. And the trial court will retain broad discretion to interpret these provisions and to decide precisely how they mesh with the Cities' proposed diverted-services evidence. But given the broad range of damages allowable under the hazardous substances statutes, to adopt a literal and inflexible view of subsection .822(a)'s cost clauses would be fundamentally inconsistent with what we perceive to be the legislature's primary intent in enacting these provisions: to hold responsible parties strictly liable for all provable spill-related harms.

**D. The Cities Have Not Waived Their Right to Argue Their Diverted–Services Claims.**

■ After the superior court dismissed the diverted-services claims on summary judgment, the Cities asserted a more modest claim for unreimbursed labor. This claim had been subsumed within, but was legally distinct from, their diverted-services claims, and thus survived the summary judgment order. The parties eventually settled the remaining triable issues; their settlement included the Cities' claim for unreimbursed labor, which the parties valued at $88,900. As part of the settlement, the Cities expressly reserved the right to appeal the trial court's dismissal of their diverted-services claims. Accordingly, the settlement agreement specifically provided that if the Cities prevailed on appeal and went on to win their diverted-services claims on remand, their eventual diverted-services award would be reduced to reflect the $88,900 settlement payment they had already received for the subsumed, unreimbursed-labor claim.

Because the Cities based their unreimbursed-labor claim on evidence that overlaps the evidence they relied on to support their "cost of response" theory of recovery for diverted services, Exxon argues that the settlement bars them from arguing costs of response as a theory of damages on appeal. But Exxon bases this argument on the narrow view that the Cities' diverted-services claims can only be compensated under subsection .822(a)'s specific costs provisions. We have held that this narrow view of damages is legally unfounded. Since the Cities expressly reserved the right to appeal the dismissal of their diverted-services claims and these claims are not limited to unreimbursed labor, we hold that the Cities have not waived the right to argue their diverted-services claims on appeal.

**E. The Hazardous Substances Statutes Confer Standing on the Cities to Assert Diverted–Services Claims.**

■ Exxon contends that the Cities' diverted services actually belonged to their

citizens, not to the Cities themselves. For this reason, Exxon argues, the Cities lack standing to maintain these claims. But this argument overlooks the express language of the hazardous substances statutes. By defining damages to include costs incurred "by a state, a municipality, or a village," [40] section .822(a) itself vests injured municipalities with standing to sue. Exxon cites no convincing authority to the contrary. In support of its theory that the Cities lack standing, it primarily relies on two cases—both distinguishable from the case at bar. One case, *In re Oil Spill by the Amoco Cadiz*,[41] involved municipal claims for damages suffered by recreational visitors, not residents.[42] The other case, *Iowa ex rel Miller v. Block*,[43] involved a suit by the State of Iowa for emergency benefits actually belonging, and payable directly, to certain individual citizens.[44] Here, by contrast, the Cities seek to recover damages to replenish their own coffers with municipal funds that they could expend for the benefit of their citizens, as originally intended.

Since neither *Amoco Cadiz* nor *Iowa v. Block* supports Exxon's arguments, we conclude that the Cities have standing to sue.

F. *Federal Maritime Law Does Not Preempt the Cities' Diverted–Services Claims.*

■ Exxon contends that federal maritime law preempts the Cities' diverted-ser-

vices claims, even if Alaska's hazardous substances statutes allow them. Although federal law applies to state cases falling within admiralty jurisdiction, states are not barred from applying their own laws unless "the state remedy 'works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations.' " [45]

Exxon bases its federal-preemption argument on *Robins Dry Dock & Repair Company v. Flint*,[46] an admiralty case that is commonly read to hold "that economic losses arising from a tort, but unaccompanied by a physical injury to anything in which plaintiff has a proprietary interest, are not compensable under federal maritime law." [47] Since AS 46.03.822 undeniably provides a cause of action for purely economic damages,[48] Exxon asserts that Alaska law directly conflicts with the maritime rule of *Robins*. Hence, according to Exxon, the Cities' diverted-services claims are preempted.

■ To determine whether the Cities' claims are preempted, we must engage in a twofold inquiry: first, we must ask whether AS 46.03.822, as applied in this case, works material prejudice to a "characteristic feature[ ] of the general maritime law"; [49] second, we must ask whether the statute unduly

---

**40.** AS 46.03.822(a).

**41.** 954 F.2d 1279 (7th Cir.1992), *aff'd*, 4 F.3d 997 (7th Cir.1993).

**42.** *Id.* at 1321.

**43.** 626 F.Supp. 15 (S.D.Iowa 1984), *aff'd on grounds cited, rev'd on other grounds*, 771 F.2d 347 (8th Cir.1985).

**44.** *See id.* at 17–18.

**45.** *Hughes v. Foster Wheeler Co.*, 932 P.2d 784, 787 (Alaska 1997) (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 447, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (citations omitted)). *Cf. Barber v. New England Fish Co.*, 510 P.2d 806, 811 (Alaska 1973) (key inquiry regarding federal maritime preemption of the exclusive-remedies rule of the Alaska Workers' Compensation Act is whether the state rule "would materially prejudice the characteristic features of federal law and interfere with the uniformity of that law").

**46.** 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927).

**47.** *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 625 (1st Cir.1994); *see also Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 51–52 (1st Cir.1985); *Getty Ref. & Mktg. Co. v. MT Fadi B.*, 766 F.2d 829, 830–32 (3rd Cir.1985); *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1021–32 (5th Cir.1985) (en banc); *In re Glacier Bay*, 865 F.Supp. 629, 632 (D.Alaska 1991).

**48.** *See* AS 46.03.822 (defining "damages" broadly); AS 46.03.824 (same).

**49.** *American Dredging*, 510 U.S. at 447, 114 S.Ct. 981 (quoting *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 216, 37 S.Ct. 524, 61 L.Ed. 1086 (1917)).

interferes with the harmony and uniformity of the admiralty system.[50] If we answer either of these questions affirmatively, federal maritime law preempts the more expansive state remedy.[51]

▉ Although the *Robins* rule has had widespread application in admiralty,[52] we are convinced that it is not a "characteristic feature" of admiralty law. For purposes of maritime preemption, a "characteristic feature of the general maritime law" is one that "originated in admiralty" or "has exclusive application there[in]."[53] In *Ballard Shipping v. Beach Shellfish*,[54] the First Circuit, construing *Robins*, held that federal admiralty law did not preempt a Rhode Island law permitting recovery of economic losses "caused by the violation of any ∴ piloting or water pollution laws."[55]

In reaching this conclusion, the *Ballard Shipping* court "found no evidence that *Robins*'s denial of recovery for purely economic

losses originated in admiralty."[56] The court noted that *Robins*'s precedential roots extend equally into admiralty and non-admiralty case law[57] and that in any event the precedent *Robins* cited reflected no more than a general, once-widely-cited principle denying liability for purely economic loss in cases involving negligent interference with contractual rights.[58] The *Ballard Shipping* court also observed that the *Robins* doctrine did not apply exclusively in admiralty: "Courts have denied liability for purely economic harm in a variety of land-based contexts."[59]

▉ Since *Ballard Shipping* convincingly negates origin and exclusivity as grounds for preemption, we must determine whether Alaska law " 'interferes with the proper harmony and uniformity' of maritime law."[60] Courts apply a balancing test to decide issues of harmony and uniformity.[61] One commentator concisely explains:

**50.** *See American Dredging*, 510 U.S. at 447, 114 S.Ct. 981; *see also Romero v. International Terminal Operating Co.*, 358 U.S. 354, 373, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *Hughes*, 932 P.2d at 788–89.

**51.** *See American Dredging*, 510 U.S. at 447, 114 S.Ct. 981; *Ballard Shipping*, 32 F.3d at 627.

**52.** *See, e.g., Barber Lines*, 764 F.2d 50; *Getty Ref. & Mktg. Co.*, 766 F.2d 829; *Louisiana ex rel. Guste*, 752 F.2d 1019 (en banc); *see also In re Glacier Bay*, 865 F.Supp. at 635–38; *In re Exxon Valdez*, 767 F.Supp. 1509, 1511 (D.Alaska 1991) (barring general tort claims under the *Robins* rule and applying the rule to claims under state strict-liability statute which exceeded $100 million).

**53.** *American Dredging*, 510 U.S. at 450, 114 S.Ct. 981 (quoting in part *Southern Pac. Co.*, 244 U.S. at 216, 37 S.Ct. 524).

**54.** 32 F.3d 623 (1st Cir.1994).

**55.** *Id.* at 626, 631.

**56.** *Id.* at 625, 627.

**57.** *See id.* at 627–28 (noting that of the four cases that Justice Holmes cited to support the rule in *Robins* only two of them were admiralty cases) (citing *Savings Bank v. Ward*, 100 U.S. 195, 25 L.Ed. 621 (1879) (non-admiralty); *Elliot Steam Tug Co. v. Shipping Controller*, 1 K.B. 127, 139, 140 (1922) (admiralty); *Byrd v. English*, 117 Ga. 191, 43 S.E. 419 (1903) (non-admiralty); *The*

*Federal No. 2*, 21 F.2d 313 (2d Cir.1927) (admiralty)).

**58.** *See Ballard Shipping*, 32 F.3d at 628 (citing Patrick S. Atiyah, *Negligence and Economic Loss*, 83 L.Q. Rev. 248, 248–51 (1967) (tracing the rule to *Cattle v. Stockton Waterworks Co.*, 10 Q.B. 453 (1875), a non-admiralty case involving a construction company suing for damages caused by leaky water pipes) and *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1022 (5th Cir. 1985) (en banc)).

**59.** *See Ballard Shipping*, 32 F.3d at 628 (footnote omitted); *see also Dundee Cement Co. v. Chemical Labs., Inc.*, 712 F.2d 1166, 1169–70 (7th Cir.1983) (denying recovery for pure economic loss where defendant blocked access to plaintiff's business); *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.*, 345 N.W.2d 124, 128 (Iowa 1984) (denying recovery for pure economic loss sustained when structural problems caused a bridge closure); P. Keeton, *Prosser and Keaton on Torts* § 129, at 999–1002 (5th ed.1984); Robert L. Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment*, 37 Stan. L.Rev. 1513, 1528 (1985) (discussing land-based cases).

**60.** *American Dredging Co. v. Miller*, 510 U.S. 443, 450, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (quoting *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 216, 37 S.Ct. 524, 61 L.Ed. 1086 (1917)).

**61.** *See Ballard Shipping*, 32 F.3d at 628; *see also Kossick v. United Fruit Co.*, 365 U.S. 731, 738–42, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); *Huron Port-*

[S]tate law will not be preempted if the state has a strong interest in the subject matter and there is correspondingly little need for uniformity; if, however, there is a strong federal interest, state law will not be allowed to impair the essential uniformity of maritime law.[62]

The Cities correctly argue ·that the state has a strong interest in regulating oil pollution and in providing remedies for damages caused by oil spills. In *Askew v. American Waterways Operators, Inc.*,[63] the United States Supreme Court confirmed that a Florida statute regulating oil pollution and providing for recovery of economic damages was within the state's police powers.[64] Describing oil spills as "an insidious form of pollution of *vast concern* to every coastal city or port and to all the estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent,"[65] the Court recognized the state's strong interest in protecting its local waters from pollution and found the statute not preempted.[66]

Of course, federal concern in barring recovery for purely economic damages "is not without importance";[67] as the court in *Ballard Shipping* noted, a "regime of liability" may threaten or impose high costs on maritime commerce.[68] If the regime is difficult to administer, it may result in inefficient and inconsistent application.[69] There is at least some risk that a state law imposing liability on ship owners and operators for purely economic losses might impede "the free flow of maritime commerce"—a legitimate federal interest in admiralty.[70]

■ But we agree with *Ballard Shipping* that the general federal interest in barring recovery for purely economic damages is less significant than it historically has been due to recent federal legislation. In both the Trans–Alaska Pipeline Authorization Act (TAPAA)[71] and the Oil Pollution Act of 1990 (OPA 90),[72] Congress to a certain extent repudiated the *Robins* rule and expanded the kinds of damages recoverable under maritime law.[73] Moreover, TAPAA's language

land Cement Co. v. City of Detroit, 362 U.S. 440, 442–48, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Just v. Chambers*, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941); *Brockington v. Certified Elec. Inc.*, 903 F.2d 1523, 1530 (11th Cir.1990).

**62.** Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 4–5, at 147–48 (2d ed.1994) (footnotes omitted).

**63.** 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973).

**64.** *See id.* at 328–29, 93 S.Ct. 1590.

**65.** *Id.* (emphasis added).

**66.** *See id.* at 327–29, 93 S.Ct. 1590.

**67.** *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 629 (1st Cir.1994).

**68.** *Id.* at 630.

**69.** *See id.*

**70.** *See American Dredging Co. v. Miller*, 510 U.S. 443, 457–58, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (Souter, J., concurring) (commenting that "whether federal maritime law pre-empts state law will turn on whether the state rule unduly interferes with the federal interest in maintaining the free flow of maritime commerce"); *but cf. id.* at 452 n. 3, 114 S.Ct. 981 (Scalia, J.) (instructing that "the principle that the States may not impair maritime commerce" is not "the unifying theme of this aspect of [the Supreme Court's] admiralty jurisprudence").

**71.** 43 U.S.C. §§ 1651–1656 (1994).

**72.** Pub.L. No. 101–380, 104 Stat. 484 (1990) (codified as amended in scattered sections of titles 14, 16, 23, 26, 33, 43, and 46 of the United States Code).

**73.** For example, portions of the TAPAA expand liability in a manner that arguably displaces *Robins. See Slaven v. BP America, Inc.*, 786 F.Supp. 853, 859 (C.D.Cal.1992). Under § 1653(c)(1), TAPAA imposes strict ·liability for damages caused by an oil spill on owners and operators of vessels and the Trans–Alaska Pipeline Fund, with a cap of $100 million on recovery. A claimant may pursue any claims under § 1653(c)(1) that are not satisfied in full under other applicable state and federal law. *See* TAPAA § 1653(c)(3) & (9); *see also Slaven*, 786 F.Supp. at 857. Section 1653(c)(9) clarifies that "[t]his subsection shall not be interpreted to preempt the field of strict liability or to preclude any State from imposing additional requirements."

Most federal district courts agree that § 1653(c)(1) of TAPAA trumps the *Robins* rule. *See Slaven*, 786 F.Supp. at 857–59 (TAPAA repealed *Robins*, at least in part); *accord In re Exxon Valdez*, 767 F.Supp. 1509, 1515 (D.Alaska 1991); *In re Glacier Bay*, 746 F.Supp. 1379, 1384–86 (D.Alaska 1990).

Courts are split as to whether additional state remedies for purely economic losses in excess of

and legislative history support the conclusion that Congress intended the Act to permit states to provide additional remedies for harm caused by oil spills in maritime cases.[74] And most commentators have also read OPA 90 to impose liability for purely economic damages.[75] Thus, future application of TAPAA and OPA 90 will diminish uniformity in applying the *Robins* rule in oil-spill cases. To this extent, the federal interest in uniform application of the *Robins* rule appears to have been diminished and may no longer be compelling.

On balance, we are convinced that Alaska's strong interest in protecting its waters and providing remedies for damages resulting from oil spills outweighs the diminishing federal interest in achieving interstate harmony through the uniform application of *Robins*.[76] We conclude, therefore, that, in allowing recovery for purely economic damages, Alaska's hazardous substances statutes do not unduly interfere with the harmony or uniformity of federal maritime law.

Because the *Robins* rule is not a "characteristic feature" of admiralty and the application of Alaska law will not unduly interfere with the harmony and uniformity of the admiralty system, we hold that federal law does not preempt enforcement of the damages provisions of Alaska's hazardous substances statutes.

## III. *CONCLUSION*

The Cities' diverted-services claims fall within the broad ambit of AS 46.03.822 and AS 46.03.824. The superior court therefore erred in granting Exxon's motion for summary judgment, and we REVERSE and REMAND for further proceedings.

MATTHEWS, Chief Justice, COMPTON, EASTAUGH, and FABE, Justices, not participating.

the $100 million cap are available under § 1653(c)(3). *See In re Exxon Valdez,* 767 F.Supp. at 1515–16 (finding AS 46.03.822 subject to *Robins* based on the conclusion that Congress could not delegate the power to legislate concerning rights and responsibilities in admiralty); *but see Slaven,* 786 F.Supp. at 860 (finding that the *Robins* rule does not preempt remedies provided by Alaska statute under TAPAA, 43 U.S.C. § 1653(c)(3)). But most of the cases finding additional state remedies preempted were decided before *American Dredging* narrowly defined what constitutes a "characteristic feature" of admiralty law. *See, e.g., In re Exxon Valdez,* 767 F.Supp. at 1509 (decided three years before *American Dredging*).

**74.** *See* 43 U.S.C. §§ 1653(c)(3) & (9). The TAPAA conference report specified that "[s]tates are expressly not precluded from setting higher limits or from legislating in any manner not incon-

sistent with the provisions of this Act." H.R. Conf. Rep. No. 93–624 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2523, 2531; *see also In re Exxon Valdez,* 767 F.Supp. at 1515.

**75.** *See Ballard Shipping Co. v. Beach Shellfish,* 32 F.3d 623, 630–31 & n. 6 (1st Cir.1994) (citing Gregg L. McCurdy, *An Overview of OPA 1990 and Its Relationship to Other Laws,* 5 U.S.F. Mar. L.J. 423 (1993), and Francis J. Gonynor, *The Robins Dry Dock Rule: Is the "Bright Line" Fading?* 4 U.S.F. Mar. L.J. 85 (1992)). *But see In re·Petition of Cleveland Tankers, Inc.,* 791 F.Supp. 669, 678–79 (E.D.Mich.1992).

**76.** *See Slaven,* 786 F.Supp. at 864–65; *Ballard Shipping,* 32 F.3d at 628–29; *see also In re Nautilus Motor Tanker Co.,* 900 F.Supp. 697, 704–05 (D.N.J.1995) (noting that the *Robins* rule has never completely precluded recovery, even in admiralty).