*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KIMBERLY WALLACE GOODWIN, and JONATHON GOODWIN, individually and as the parents of JACKSON WALLACE GOODWIN, | ) ) ) ) |
| | ) |
| Appellants and Cross-Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| MAT-SU MIDWIFERY, INC., d/b/a MAT-SU MIDWIFERY AND FAMILY HEALTH, JUDI DAVIDSON, and DARCY LUCEY, | ) ) ) ) ) |
| | ) |
| Appellees and Cross-Appellants. | ) |
| | ) |

Supreme Court Nos.: S-18401/18411

Superior Court No.: 3AN-14-10649 CI

O P I N I O N

No. 7733 – December 6, 2024

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Ted Stepovich, Law Office of Ted Stepovich, Anchorage, and Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellants and Cross-Appellees. John J. Tiemessen, Clapp Peterson Tiemessen Thorsness, LLC, Fairbanks, for Appellees and Cross-Appellants.

Before: Maassen, Chief Justice, and Carney, Borghesan, and Pate, Justices. [Henderson, Justice, not participating.]

BORGHESAN, Justice.

# I.    INTRODUCTION

This appeal arises from a medical malpractice suit.  The parents of a stillborn child sued the midwives attending the birth for malpractice.  The plaintiffs alleged, among other things, that the midwives failed to obtain informed consent for delivery by midwife at a birth center, instead of delivery by physician at a hospital.  The plaintiffs alleged that the midwives did not disclose the risks of midwife delivery for expectant mothers like the plaintiff:  a woman of advanced maternal age with a history of miscarriage.  The superior court granted summary judgment in favor of the midwives, ruling that the plaintiffs failed to present evidence that midwife delivery caused the child to be stillborn.

The key issue in this appeal concerns the element of proximate cause in informed consent claims.  The plaintiffs argue that they presented sufficient evidence of causation to survive summary judgment because they showed they would not have opted for midwife delivery had they been properly informed of the risks.  But this evidence was not enough.  To prevail on a claim of informed consent, a plaintiff must prove two aspects of proximate cause:  first, that the plaintiff would not have consented to the treatment or course of care had the risks been disclosed; and second, that the treatment or course of care caused the plaintiff's injury.  The midwives presented expert opinion indicating that their care did not cause the stillbirth, and the plaintiffs did not meet their burden to present evidence that the midwives' care *did* cause the stillbirth. Therefore, we affirm summary judgment in the midwives' favor.  We also affirm the superior court's award of enhanced attorney's fees based on the plaintiffs' vexatious litigation conduct.

# II.    FACTS AND PROCEEDINGS

## A.    Facts

Kimberly Wallace Goodwin became pregnant in 2012.  She and her husband, Jonathon Goodwin, named the unborn child Jackson.  Kimberly was 39 years old at the time of this pregnancy and had previously suffered several miscarriages.

After Kimberly became pregnant, the Goodwins engaged a doctor for obstetrical care. In October 2012 the doctor transferred Kimberly's care to Mat-Su Midwifery, Inc. ("Midwifery") for delivery of the child. On November 21, approximately 40 weeks into her pregnancy, Kimberly attended an appointment at the Midwifery. She was cared for by a direct entry midwife, Judi Davidson, and a certified nurse midwife, Darcy Lucey.[1] Kimberly expressed concerns in that appointment that she was overdue.[2] According to the Goodwins, Davidson and Lucey told Kimberly to return in one week.

Kimberly returned to the clinic on November 28 and was again told to return in one week. She returned on December 3, nearly 42 weeks into her pregnancy. A test was performed, which indicated that the fetus was "reactive." Kimberly was told to return in two days. She returned on December 5, and then again on December 6 when she was in active labor.

Lucey initially monitored Kimberly. The Midwifery's records indicate that at 11:00 a.m., Jackson's fetal heart rate was 130-140 and that at 11:30 a.m. his fetal heart rate was 120. Lucey announced at this time that she was not sure if she was detecting Jackson's heartrate or Kimberly's. Davidson joined Lucey at 12:15 p.m. and checked the fetal heartrate. At 12:15 p.m. and 12:25 p.m., the fetal heartrate was

---

[1]     There are statutes and regulations governing direct entry midwives, but they do not appear to define what a direct entry midwife is. *See* AS 08.65.010 – 08.65.190; 12 Alaska Administrative Code (AAC) 14.110 – 14.990. According to the parties' briefing below and the superior court's order, a direct entry midwife operates independently of a hospital setting, while a certified nurse midwife has additional training and certifications. *See also* 12 AAC 14.500(b)-(c) (describing duties of direct entry midwife toward "home-birth client"). The precise definition of a direct entry midwife is not central to this opinion.

[2]     A pregnancy is considered full-term from 39 weeks through 40 weeks and 6 days. Nat'l Child & Maternal Health Educ. Program, Nat'l Inst. of Health, https://www.nichd.nih.gov/ncmhep/initiatives/know-your-terms/moms (June 2, 2022).

recorded at 70-80. Shortly thereafter, Davidson and Lucey transported Kimberly to the hospital, where Jackson was delivered stillborn via caesarian section.

Following the stillbirth, the Goodwins lobbied the legislature to pass a statute creating a cause of action for the wrongful death of an unborn child. Their testimony to the legislature implied that Alaska law did not recognize such an action.

The resulting statute was codified as Alaska Statute 09.55.585 and named "Jackson's Law."[3] The uncodified portion of the law provides: "This Act applies to actions arising from a wrongful act or omission that takes place on or after the effective date of this Act."[4] The effective date was in October 2014, nearly two years after Jackson's stillbirth.[5]

## B.    Proceedings

In December 2014 the Goodwins, "individually and as the parents of Jackson," filed suit against the Midwifery, Lucey, and Davidson (collectively "the Midwifery"), on claims of negligence and lack of informed consent.[6]

In February 2017 the Goodwins filed a list identifying their expert witnesses. This list named Dr. Donald Rogers, the forensic pathologist who had performed the autopsy on Jackson. However, by this time Dr. Rogers' medical license had lapsed. He died in 2019 without ever having been deposed. The Goodwins also named Kathryn Osborne, a certified nurse midwife, as their expert.

In March 2017 the Midwifery moved for summary judgment. It argued that (1) there was no cause of action for the death of an unborn child under the general wrongful death statute, AS 09.55.580, and (2) quasi-estoppel barred the Goodwins from utilizing this statute due to their testimony before the legislature that no cause of action

---

[3]    Ch. 77, SLA 2014.

[4]    *Id.*

[5]    *Id.*

[6]    The Goodwins also brought several other claims that are not relevant to this appeal.

existed under that law. Opposing the motion, the Goodwins argued that a majority of states allow wrongful death claims for viable unborn children and that the same approach should be adopted in Alaska. They also disputed that quasi-estoppel applied to them.

The superior court denied this motion for summary judgment. The court held that the general wrongful death statute provided the Goodwins with a cause of action.[7] And it concluded that the Goodwins' claims were not barred by quasi-estoppel.

In December 2018 the Midwifery moved to exclude Osborne's expert testimony, arguing that her experience and knowledge as a certified nurse midwife did not qualify her to testify on the standard of care applicable to Davidson, a direct entry midwife.[8] The Goodwins opposed this motion.

The superior court did not immediately rule on this motion. The delay was a result of a trial continuance, granted due to the Goodwins' divorce, uncertainty regarding whether their counsel could continue with the representation, and questions about Kimberly's capacity for trial. Due to this delay, the Midwifery moved for costs incurred in preparing for the continued trial. The superior court granted the request in part.

Over the next few months, the superior court expressed frustration with the Goodwins' behavior. After Kimberly failed to verify her discovery requests, despite numerous orders, the court imposed sanctions. After the Goodwins failed to pay those sanctions more than a year and a half later, the court found that the Goodwins were willfully disobedient. In July 2020 the court denied the Goodwins' motion for

---

[7] The superior court cited an Oregon case, *Libbee v. Permanente Clinic*, 518 P.2d 636, 637-40 (Or. 1974), which held that a viable unborn child is a "person" under Oregon's similar wrongful death statute. The superior court also noted that, as a remedial statute, AS 09.55.580(a) should be interpreted liberally to avoid unjust results.

[8] In cases of professional negligence an expert witness must be "trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue." AS 09.20.185(a)(2).

reconsideration of the court's willful disobedience finding, stating that the case was being "stalled in a way [it had] never seen in a case before. Motions having to be filed. Fees having to be incurred."

Eventually, in September 2020, the superior court granted the Midwifery's motion to exclude Osborne as an expert witness. The court concluded that Osborne, "as a certified nurse midwife who has practiced exclusively in hospitals, has an insufficient basis for testifying about the standard of care ordinarily exercised by direct entry midwives." The court gave the Goodwins until January 2021 to file an updated witness list. The court then extended the deadline to April 2021.

In April 2021 Kimberly provided an affidavit from a new expert on the standard of care, Elizabeth Cook, a certified professional midwife. In the body of Cook's expert report, she alleged that the Midwifery "failed to meet applicable standards of care" in ten different ways. She opined that the Midwifery's failure "to meet applicable standards of care . . . contributed to the demise of" Jackson.

The Midwifery deposed Cook. The Midwifery's counsel questioned Cook on the cause of the stillbirth:

> Q. Okay. And you will agree with me in your 15 April 2021 affidavit report you don't state what medical condition Jackson Goodwin died from?
>
> A. I don't give a medical diagnosis . . . for the demise. I give contributing factors.
>
> Q. Have you ever made a determination of cause of death on a death certificate?
>
> A. I have not.
>
> Q. And in your practice, would you typically defer to pathologists for determination of causes of death?
>
> A. I would defer to the neonatology experts in collaboration with pathology, potentially in collaboration with obstetrical

experts as to cause of death, but I may contribute . . . events leading to that or contributing factors to a cause of death.

. . .

Q. Are you able to say on a more-likely-than-not basis that any of the deficits that you identified in your report more likely than not caused the fetal demise.

A. What I can say is that, as I pointed out in my report, that failure to provide fully informed consent for shared decision making as to all options for care and current evidence on recommendations for care based on the individual factors of Kimberly Goodwin's situation, particularly AMA, or advanced maternal age, and post-term or late-term gestation potentially contributed to the demise of this baby . . . . And as I also pointed out, that failure to respond in a timely manner when heart tones dropped in labor also potentially contributed to the death of this baby. And overall, we see significant failure on the part of Mat-Su Midwifery to provide a quality care to this patient.

When pressed, Cook stated that either inadequate record keeping prevented a definitive diagnosis or that a specialist would ultimately need to weigh in on the cause of Jackson's death.

In January 2022 the Midwifery moved for summary judgment again. The Midwifery submitted an affidavit from its own causation expert, Dr. Judy Melinek, a forensic pathologist. Dr. Melinek concluded that the stillbirth was caused by "intrauterine fetal demise due to chorioamnionitis and funisitis." Dr. Melinek asserted that this diagnosis meant "that the placenta and umbilical cord supplying blood to the infant were damaged by an infection prior to delivery." According to Dr. Melinek, "[c]horioamnionitis and funisitis are well-described natural causes for intrauterine fetal demise regardless of type of delivery and type of obstetrical care." The affidavit concluded that there was no pathologic evidence to support the claim that the midwives' care and treatment during delivery caused Jackson's demise.

In its motion, the Midwifery quoted from Cook's deposition and argued that she had failed to state an opinion on the cause of death. The Midwifery argued that

the Goodwins could not rebut Dr. Melinek's explanation for the cause of death and therefore failed to establish a dispute of material fact as to whether the Midwifery's care caused Jackson's death. The Goodwins did not oppose this motion for summary judgment.

The superior court granted the motion for summary judgment in February 2022. The superior court noted that "whether a plaintiff must present expert testimony on causation depends on the nature of the injury and the plaintiff's causation theory," but the Goodwins had "not filed *any* opposition — and thus no theory of causation or supporting evidence." The court also observed that Cook had been "retained on the standard of care issue, but not causation." Thus, the court concluded that it "need not determine whether now at issue is a 'technical' or 'non-technical' theory of causation" and granted summary judgment. The court requested briefing on whether its ruling on causation disposed of all claims.

The Midwifery filed a motion for final judgment arguing that both the negligence claim and the informed consent claim hinged on causation. Jonathon opposed this motion, asserting that (1) Cook was qualified to testify on causation, and (2) expert testimony is not required to prove causation in an informed consent claim. With respect to the second argument, Jonathon relied on our decision in *Poulin v. Zartman* to argue that establishing proximate cause in an informed consent claim merely requires evidence that the plaintiff would have declined the procedure or chosen a different course if adequately informed.[9] The court entered final judgment against the Goodwins and dismissed all claims.

Jonathon moved for reconsideration. He argued that the superior court failed to consider Cook's report. The superior court denied reconsideration. It

---

[9]    *Poulin v. Zartman*, 542 P.2d 251, 275 (Alaska 1975) (concluding plaintiff failed to prove proximate cause because "[t]he record fail[ed] to establish that, had he known of the alternative, he would have declined the procedure which was employed"), *overruled on other grounds by State v. Alex*, 646 P.2d 203, 208 n.4 (Alaska 1982).

explained that it had considered Cook's affidavit and deposition when granting summary judgment, but she had not expressed an opinion on the cause of death. The court also explained that proximate causation is an element of an informed consent cause of action. The court concluded that because "Cook's affidavit contains no reference to . . . whether . . . failure to inform proximately caused any harm," summary judgment against the Goodwins was warranted.

The Midwifery moved for enhanced fees under Alaska Civil Rules 82(b)(3) and 95.[10] The Midwifery argued that the Goodwins had engaged in "seven years of stop and start litigation," ignoring deadlines, procedures, and discovery requirements. At oral argument, the Goodwins' former counsel stated that "from the very beginning . . . there was no case here and that has not changed." The former counsel added that the Goodwins had difficulty retaining an expert on causation; "it did evolve into a point where getting that expert . . . was close to impossible."

The court granted the motion and awarded $295,923.61 in fees and $35,653.63 in costs jointly and severally against the Goodwins. The court made several findings: (1) the case was uniquely complicated; (2) the case twice came to the eve of trial, causing the Midwifery to incur trial preparation costs twice; (3) the Midwifery's attorney's fees were reasonable; (4) the Midwifery used a reasonable number of attorneys; (5) the Midwifery's attorney tried to minimize fees; (6) around April 2019 the Goodwins' responsiveness began to deteriorate and their claims became unreasonable; (7) the Goodwins' actions after April 21, 2019, were vexatious and in bad faith; and (8) the Midwifery litigated the case in a proper manner while the Goodwins did not, which drove up fees.

The parties now appeal. The Goodwins appeal the superior court's summary judgment ruling in the Midwifery's favor and the award of enhanced

---

[10]    Alaska R. Civ. P. 82(b)(3) (allowing court to vary standard attorney's fee award upon consideration of listed factors); Alaska R. Civ. P. 95 (allowing court to withhold or assess attorney's fees to penalize infraction of Civil Rules).

attorney's fees. The Midwifery cross-appeals, arguing that the superior court erred in construing the wrongful death statute and in declining to estop the Goodwins' arguments related to that statute.[11]

## III.    STANDARD OF REVIEW

"We review a grant of summary judgment de novo, applying our independent judgment."[12] "We affirm a grant of summary judgment if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law."[13] "Whether the evidence presented a genuine issue of material fact is a question of law that we independently review."[14] "When applying the de novo standard of review, we apply our 'independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy.' "[15]

"We review the denial of a motion for reconsideration for abuse of discretion."[16] "The abuse of discretion standard asks 'whether the reasons for the

---

[11]    The Midwifery was not required to cross-appeal to raise these arguments in support of the judgment. "[A]n appellee may urge . . . in defense of a decree or judgment any matter appearing in the record, even if rejected below and even if [the] appellee's argument may involve an attack upon the reasoning of the lower court or an insistence upon [a] matter overlooked or ignored by it." *Nicolos v. N. Slope Borough*, 424 P.3d 318, 325 (Alaska 2018) (quoting *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961)).

[12]    *Kalenka v. Infinity Ins. Cos.*, 262 P.3d 602, 607 (Alaska 2011).

[13]    *Ball v. Birch, Horton, Bittner & Cherot*, 58 P.3d 481, 485 (Alaska 2002).

[14]    *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014) (quoting *Kalenka v. Jadon, Inc.*, 305 P.3d 346, 349 (Alaska 2013)).

[15]    *Id.* (quoting *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 802 (Alaska 2011)).

[16]    *Szabo v. Mun. of Anchorage*, 320 P.3d 809, 813 (Alaska 2014) (quoting *Alaskan Adventure Tours, Inc. v. City & Borough of Yakutat*, 307 P.3d 955, 959 (Alaska 2013)).

exercise of discretion are clearly untenable or unreasonable' and fall outside the boundaries of reasonable responses."[17]

We review an award of attorney's fees for abuse of discretion.[18] Abuse of discretion exists if the award is "arbitrary, capricious, manifestly unreasonable, or improperly motivated."[19] "Because an enhanced fee award under Rule 82(b)(3)(G) calls into question a party's litigation conduct and the potential merits of the party's arguments and defenses, we assess de novo the legal and factual viability of the party's claims and review relevant findings of fact for clear error."[20]

## IV. DISCUSSION

The parties have presented many issues for our consideration on appeal, but the key issue is causation. The superior court ruled that the Goodwins did not present evidence rebutting the Midwifery's evidence that its conduct did not cause Jackson to be stillborn, so the Goodwins' negligence and informed consent claims failed. Because we agree with the superior court that the Goodwins needed to present this evidence and did not, we agree with the court's conclusion that their claims could not survive summary judgment. Therefore, the issues occupying most of the parties' briefing are beside the point: whether the superior court erred in deciding that the Goodwins' first expert was not qualified to opine on the applicable standard of care; whether the court correctly interpreted the wrongful death statute prior to the enactment of "Jackson's Law" to permit recovery for the death of an unborn person; and whether

---

[17]     *Buchholdt v. Nelson*, 534 P.3d 91, 93 (Alaska 2023) (quoting *Moore v. Moore*, 349 P.3d 1076, 1084 (Alaska 2015)).

[18]     *Nautilus Marine Enters., Inc. v. Exxon Mobile Corp.*, 332 P.3d 554, 557 (Alaska 2014).

[19]     *Roderer v. Dash*, 233 P.3d 1101, 1106 (Alaska 2010) (quoting *Rhodes v. Erion*, 189 P.3d 1051, 1053 (Alaska 2008)).

[20]     *Keenan v. Meyer*, 424 P.3d 351, 356 (Alaska 2018) (internal quotation marks and brackets omitted) (quoting *Herring v. Herring*, 373 P.3d 521, 528 (Alaska 2016)).

the court should have estopped the Goodwins from arguing that the law permitted their claim for wrongful death when they suggested to the legislature that it did not. However, we do address and affirm the superior court's award of enhanced attorney's fees to the Midwifery.

>    **A.    The Superior Court Did Not Err In Granting Summary Judgment To The Midwifery Because The Goodwins Did Not Present Evidence That The Midwifery's Treatment Caused Jackson To Be Stillborn.**

An essential element of any tort claim is causation.[21]  The plaintiff must show that the defendant caused the harm that the plaintiff has suffered.[22]  The Goodwins do not dispute that their medical malpractice claim requires them to prove that the Midwifery's negligence caused Jackson to be stillborn.[23]  But they appear to argue that their informed consent claim requires proving only that, had the Midwifery properly informed them of the risks of midwife delivery, they would not have opted for midwife delivery and would have opted for delivery in a hospital instead.  Implicit in this position is the argument that the Midwifery's failure to obtain informed consent makes the Midwifery liable for any harm that occurred to the mother or child, even if there is no evidence that those harms were caused by having a midwife-assisted delivery.  This is not the law.

Rather, establishing causation for an informed consent claim entails two distinct showings.  The plaintiff must show that she would not have gotten the treatment or course of care if she had been properly informed of the risk.[24]  And the plaintiff must

---

[21]    *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 281 (AM. L. INST. 1965).

[22]    *See id.* §§ 431, 432.

[23]    See *id.* § 433B.

[24]    *See Canesi ex rel. Canesi v. Wilson*, 730 A.2d 805, 812 (N.J. 1999).

also show that the harm she suffered was actually caused by the treatment or course of care she received.[25] The second showing may be referred to as "medical causation."[26]

At common law, medical causation is a necessary element of informed consent claims.[27] The Alaska statute governing informed consent claims does not mention medical causation, but the text and legislative history of the medical malpractice statutes do not reveal a clear intent to change the common law elements of this tort.[28] Therefore, we conclude that under Alaska law, a plaintiff must show medical causation to prevail on a claim of informed consent.

The Goodwins failed to present evidence of medical causation in this case, and this failure is fatal to their claim. "[A] party seeking summary judgment has the initial burden of proving, through admissible evidence, that there are no [genuine] disputed issues of material fact and that the moving party is entitled to judgment as a matter of law."[29] The Midwifery moved for summary judgment, presenting Dr. Melinek's opinion that the stillbirth was caused by an infection independent of any act or omission by the Midwifery.

Once the Midwifery made this showing, the burden shifted to the Goodwins "to set forth specific facts showing that [they] could produce evidence

---

[25]     See id. at 812-13.

[26]     See id. at 812.

[27]     See generally STUART M. SPEISER ET. AL., 4A AMERICAN LAW OF TORTS § 15:73 n.1 (2024). See also Poulin v. Zartman, 542 P.2d 251, 275 (Alaska 1975) ("It is a "seemingly undisputed principle that proximate cause must be shown in order to recover for lack of informed consent." (citing Patrick v. Sedwick, 391 P.2d 453, 458 (Alaska 1964))), overruled on other grounds by State v. Alex, 646 P.2d 203, 208 n.4 (Alaska 1982).

[28]     Knolmayer v. McCollum, 520 P.3d 634, 647 (Alaska 2022) ("[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity." (alteration in original) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (West 2012))).

[29]     Mitchell v. Teck Cominco Alaska Inc., 193 P.3d 751, 760 n.25 (Alaska 2008).

reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists."[30] But the Goodwins' experts did not rebut Dr. Melinek's opinion about the cause of Jackson's death. And contrary to the Goodwins' assertion, expert evidence was required to establish medical causation in this case.[31] Whether the midwives' actions were a substantial factor in causing the stillbirth of a child is not the kind of inference that lay people can reliably determine based on their everyday experience.[32] Therefore, the "complete lack of evidence establishing causation [was] grounds for summary judgment" in favor of the Midwifery.[33]

### 1. At common law, a claim for failure to obtain informed consent requires the plaintiff to prove that the treatment obtained caused the injury.

At common law, a claim of malpractice based on a lack of informed consent generally required three elements: (1) that the practitioner failed to disclose the risks of and alternatives to a course of treatment when a reasonable practitioner would have; (2) "that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed"; and (3) "that the actual

---

[30]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014) (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)).

[31]     *See Culliton v. Hope Cmty. Res. Inc.*, 491 P.3d 1088, 1097 (Alaska 2021). ("If the connection between the defendant's conduct and the plaintiff's injury is not readily apparent to a lay person relying on 'everyday experience,' the opinion of a medical expert is required to establish this connection.").

[32]     *Compare Choi v. Anvil*, 32 P.3d 1, 4 (Alaska 2001) (For "a rear-end automobile collision causing relatively common injuries . . . like pain, stiffness, and loss of strength . . . the jury, using everyday experience, could readily find a causal relationship without [] expert assistance."), *with Culliton*, 491 P.3d at 1096-97 ("Without the aid of medical expertise, a lay person cannot reliably decide whether one particular aspiration event was a substantial cause of [pneumonia and eventually] death.").

[33]     *Culliton*, 491 P.3d at 1096.

procedure performed for which there was no informed consent was the proximate cause of the injury."[34]   As we stated in 1975, before the legislature codified the tort of informed consent in statute, it was a "seemingly undisputed principle that proximate cause must be shown in order to recover for lack of informed consent."[35]

Proximate cause can be difficult to define.  One treatise observes that "the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond.  But any attempt to impose responsibility upon such a basis would result in indefinite liability for all wrongful acts."[36]  Therefore, "[a]s a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability."[37]  The Restatement (Second) of Torts echoes this sentiment when describing negligence claims generally:  "In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. . . . The negligence must also be a substantial factor in bringing about the plaintiff's harm."[38]  "If, without the actor's negligent conduct, the other would have sustained harm, the same in character and extent as that which he receives, the actor's

---

[34]   STUART M. SPEISER ET. AL., 4A AMERICAN LAW OF TORTS § 15:73 n.1 (2024).

[35]   *Poulin v. Zartman*, 542 P.2d 251, 275 (Alaska 1975) (citing *Patrick v. Sedwick*, 391 P.2d 453, 458 (Alaska 1964)), *overruled on other grounds by State v. Alex*, 646 P.2d 203, 208 n.4 (Alaska 1982).

[36]   W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 264 (5th ed. 1984).

[37]   *Id.*

[38]   RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (AM. L. INST. 1965); *see also id.* § 433 (describing factors important in determining if actor's conduct is a substantial factor in bringing about harm to another).

conduct . . . is not even its *necessary antecedent*, and so is not a substantial factor in bringing it about."[39]

When the concept of proximate cause is applied to an informed consent claim, it requires two causal showings: that the patient received a treatment she otherwise would not have consented to if properly informed, and that the treatment was a substantial factor in bringing about the injury. The New Jersey Supreme Court explained this point in a case similar to the Goodwins' case, *Canesi ex rel. Canesi v. Wilson*.[40] In that case, parents brought an informed consent claim against a physician for failing to properly inform them of the side effects of taking a medication in early pregnancy, seeking damages for their child's congenital limb defects.[41] The court explained that "[i]n informed consent cases, proximate cause requires the plaintiff to prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if apprised of the risks that the defendant negligently failed to disclose."[42] "In addition," the court went on, "because damages in informed consent cases include the harm or physical injury to the patient, there must be medical causation, that is, a causal connection between the undisclosed risk and the injury ultimately sustained."[43] The court affirmed summary judgment in favor of the physician because the parents "presented insufficient proof of a causal relationship between the drug and the defect that afflicts their son."[44] Other courts have reached similar conclusions.[45]

---

[39]     *Id.* § 432 cmt. a (emphasis added).

[40]     730 A.2d 805 (N.J. 1999).

[41]     *Id.* at 809-10.

[42]     *Id.* at 812.

[43]     *Id.*

[44]     *Id.* at 814.

[45]     *See, e.g.*, *Looney v. Moore*, 886 F.3d 1058, 1062-70 (11th Cir. 2018) (describing Alabama law as requiring informed consent plaintiff to prove they were

These authorities confirm that medical causation is an essential element of the common law tort of informed consent.

**2.      Alaska's informed consent statute does not abrogate the common law element of medical causation.**

The Goodwins suggest that Alaska's informed consent statute, AS 09.55.556(a), requires a plaintiff to show only that she would not have chosen the treatment in question had she been properly informed of the risks. They imply that the statute does not require a showing of medical causation. Although the statutory text does not mention medical causation, we see no clear indication that the legislature intended to abrogate this element of the common law when it codified the tort of informed consent. The legislative history supports this conclusion: the legislature drafted the statute as part of a wholesale review of medical malpractice law to *limit* lawsuits and damage recoveries. Therefore, proving medical causation remains necessary to prevail on a claim of informed consent under Alaska law.

We applied the informed consent statute in *Parker v. Tomera*, but did not squarely address the need to present evidence of medical causation.[46] In *Parker*, we partially reversed a grant of summary judgment to the defendants on an informed consent claim.[47] We held that the plaintiff's failure to present expert testimony to support his claim that it was possible for the procedure to have caused his sexual dysfunction was grounds for summary judgment in favor of the defendants as to that injury.[48] However, because the defendant's expert did not offer an opinion about the other symptoms the plaintiff claimed to have suffered, there was "no expert testimony

---

"injured as a result of the particular treatment" and concluding that plaintiff provided insufficient evidence of such causation); *Andersen v. Khanna*, 913 N.W.2d 526, 544-48 (Iowa 2018) (recognizing that injury caused by procedure is essential element to informed consent claims).

[46]      89 P.3d 761 (Alaska 2004).

[47]      *Id.* at 769.

[48]      *Id.*

for [the plaintiff] to rebut" regarding those injuries, so the lack of expert testimony was not a proper basis for summary judgment as to those injuries.[49] But while we addressed the sufficiency of an informed consent claim under AS 09.55.556, we discussed the need for expert testimony in the context of the risks that had to be disclosed, which pertains to the standard of care rather than to medical causation.[50] Therefore, we do not read *Parker* as conclusively establishing the need for medical causation in informed consent claims. For that reason we review the text and legislative history of the informed consent statute.

"Whether the legislature intended to preserve, eliminate, or otherwise modify [common law rules] is an issue of statutory interpretation."[51] We interpret statutes "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[52] "When we engage in statutory construction, we must, whenever possible, 'interpret[ ] each part or section of a statute with every other part or section, so as to create a harmonious whole.' "[53] "[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity."[54]

---

[49]     *Id*.

[50]     *Id.* ("Because [defense expert's] affidavit did not address whether these were potential side effects there was no expert testimony for [plaintiff] to rebut. If infection and prostatitis are common risks of catheterization, then [plaintiff] was entitled to full information in deciding whether to consent to this procedure.").

[51]     *Knolmayer v. McCollum*, 520 P.3d 634, 643 (Alaska 2022).

[52]     *Cox v. Est. of Cooper*, 426 P.3d 1032, 1035 (Alaska 2018) (quoting *In re Est. of Baker*, 386 P.3d 1228, 1231 (Alaska 2016)).

[53]     *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) (alteration in original) (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 528 (Alaska 1993)).

[54]     *Knolmayer*, 520 P.3d at 647 (alteration in original) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (West 2012)).

The informed consent statute was enacted in 1976 as part of a package of medical malpractice reforms suggested by an expert commission convened by Governor Jay Hammond. The Commission had been created to "study and make recommendations concerning the problem of adequate professional liability insurance availability for the medical profession."[55] The Commission published its recommendations and drafted legislation to effectuate them.[56] The draft legislation included a provision on informed consent. The legislature ultimately enacted the following statute:

> A health care provider is liable for failure to obtain the informed consent of a patient if the claimant establishes by a preponderance of the evidence that the provider has failed to inform the patient of the common risks and reasonable alternatives to the proposed treatment or procedure, and that but for that failure the claimant would not have consented to the proposed treatment or procedure.[57]

Notably, the statute does not mention injury or damages at all. This silence is in contrast to the general medical malpractice statute, AS 09.55.540, which provides:

> In a malpractice action based on the negligence or willful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence . . . that, as a proximate result of [the defendant's] lack of knowledge or skill or the failure to exercise [the applicable] degree of care, the plaintiff suffered injuries that would not have otherwise been incurred.[58]

---

[55]    Report of the Governor's Medical Malpractice Insurance Commission, at 2, 13 (Oct. 1, 1975).

[56]    *Id.* at 5-10; Report of the Governor's Medical Malpractice Insurance Commission, Supplement (Oct. 31, 1975) (hereinafter Commission Report Supplement) (containing draft legislation).

[57]    Ch. 102, § 37, SLA 1976; AS 09.55.556(a).

[58]    Ch. 102, § 34, SLA 1976; AS 09.55.540(a)(4).

The contrast between the way the two statutes discuss causation could be read to suggest that an informed consent claim under AS 09.55.556(a) requires the plaintiff to prove only that she would not have consented to the procedure if fully informed. Interpreted that way, AS 09.55.556(a) would abrogate the medical causation element in the common law tort of informed consent.

But there is ample reason to doubt that interpretation. Reading AS 09.55.556 as eliminating the medical causation element would lead to absurd results. For example, a physician's failure to obtain informed consent to vaccinate a child would make the physician liable for any illness the child later suffered, even if there was no evidence the vaccine caused the illness. It seems doubtful the legislature intended to create such open-ended liability without saying so expressly. The more plausible reading of the statue is that the legislature intended only to define certain elements of the informed consent tort, not to eliminate the common law's medical causation requirement.[59] Under this reading, the legislature did not vastly expand tort liability to include any post-treatment injury regardless of a causal link to the treatment.

Another indication that the legislature did not intend to abrogate the common law's medical causation requirement is found in the legislation's provision for expert advisory panels. The legislature provided for an expert advisory panel to be appointed in malpractice actions, including those for informed consent.[60] The panel of

---

[59] *See Spencer v. Goodill*, 17 A.3d 552, 554-57 (Del. 2011) (rejecting argument that Delaware's informed consent statute silently eliminated common law causation requirement).

[60] *See* Ch. 102, § 33, SLA 1976 (codified as amended at AS 09.55.536(a)) ("In an *action for damages due to personal injury or death based upon the provision of professional services by a health care provider*, including a person providing services on behalf of a governmental entity, when the parties have not agreed to arbitration of the claim under AS 09.55.535, the court shall appoint within 20 days after the filing of an answer to a summons and complaint a three-person expert advisory panel unless the

experts must make a written report answering questions primarily relevant to causation, including: "What would have been the probable outcome without medical care?"; "Did an injury arise from the medical care?"; "What specifically caused the medical injury?"; and "Was the medical injury caused by unskillful care?"[61] Because the legislature did not exempt informed consent claims from the expert advisory panel statute, we infer that the legislature understood informed consent claims to require a showing of medical causation, notwithstanding the statute's silence on that point.

The legislative history of AS 09.55.556 does not evince any intent to abrogate the common law requirement of medical causation. Rather, it is focused on defining what informed consent means and when it must be obtained. In its report, the Medical Malpractice Commission identified the common law cause of action for informed consent: "Cases have been brought elsewhere against doctors, not because they performed a procedure negligently, but because they performed it without the permission of the patient, or allegedly obtained consent without properly explaining the consequences of the procedure to the patient."[62] The Commission then highlighted that "[p]hysicians frequently find it necessary to perform surgery or other procedures under circumstances where an informed consent cannot be obtained or where . . . it would be ill advised to be overly graphic in informing the patient of all the consequences of a needed procedure."[63]

---

court decides that an expert advisory opinion is not necessary for a decision in the case." (emphasis added)).

We have explained that the appointment of an expert advisory panel is discretionary. *See, e.g.*, *Parker v. Tomera*, 89 P.3d 761, 767-68 (Alaska 2004).

[61] Ch. 102, § 33, SLA 1976 (codified as amended at AS 09.55.536(c)).

[62] Report of the Governor's Medical Malpractice Insurance Commission, at 59 (Oct. 1, 1975).

[63] *Id.*

In response to this issue, the Commission recommended "a legislatively prescribed procedure for informing the patient of the consequences of a procedure and obtaining the consent to perform it and also setting forth the conditions pursuant to which consent is implied or not required."[64] The Commission drafted legislation effectuating this purpose.[65]

None of the other legislative history materials suggest an intent to eliminate the medical causation element of the common law tort. Doing so would have been contrary to the overall purpose of the medical malpractice reforms: to lower the cost of professional liability insurance by limiting medical malpractice litigation.[66] Given this overall purpose, it is not plausible that the legislature intended to abrogate the medical causation element of informed consent claims so as to expand liability to injuries or illnesses that were not causally connected to the treatment in question. Rather, the legislature intended to expressly define the standard of informed consent without eliminating the plaintiff's need to show that the injury was caused by the unconsented-to treatment.

### 3. The Goodwins did not present admissible evidence to dispute the opinion of the Midwifery's expert that the stillbirth was not caused by any act or omission of the Midwifery.

When moving for summary judgment on causation, the Midwifery provided expert testimony from Dr. Melinek concluding that Jackson died from a kind of infection known to cause stillbirth "regardless of type of delivery and type of obstetrical care." Dr. Melinek opined that there was no pathologic evidence to support

---

[64] *Id.*

[65] Commission Report Supplement, s*upra* note 56, at 23-24.

[66] *See* Report of the Governor's Medical Malpractice Insurance Commission, at 12 (Oct. 1, 1975) (explaining that "throughout the whole country, malpractice carrier insolvency, retrenching insurance markets, extraordinary rate increases, growing malpractice judgments and rapidly increasing frequency of litigation [were] precipitating crises").

the claim that the midwives' care and treatment during delivery caused Jackson's demise. With the Midwifery's proffer, "the burden shift[ed] to the non-moving party 'to set forth specific facts showing that [they] could produce evidence reasonably tending to dispute or contradict the movant's evidence.' "[67] But the Goodwins did not oppose the Midwifery's motion for summary judgment and therefore failed to rebut Dr. Melinek's theory of causation. Nevertheless, the court "extensively consider[ed]" their expert's affidavit and concluded that she "never expressed an opinion on cause of death."

The Goodwins argue that the court erred in granting summary judgment in favor of the Midwifery and denying their motion for reconsideration because Cook gave sufficient testimony to rebut Dr. Melinek's theory of causation. They highlight Cook's statement that "the care rendered . . . by the [Midwifery] failed to meet applicable standards of care, and thus contributed to the [stillbirth]." This statement did not satisfy the Goodwins' burden.

As discussed above, tort claims for both negligence and lack of informed consent require the alleged wrongful act or omission to have proximately caused the alleged injury. To show medical causation, the Goodwins had to show that the Midwifery's treatment was a "substantial factor" in causing Jackson to be stillborn.[68]

Cook's affidavit discussed the risks particular to an expectant mother "of advanced maternal age" who "has never previously carried a pregnancy past 20 weeks

---

[67] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014) (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)).

[68] *Winschel v. Brown*, 171 P.3d 142, 148 (Alaska 2007) ("Alaska follows the 'substantial factor test' of causation, which generally requires the plaintiff to show that the accident would not have happened 'but for' the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable individuals would regard it as a cause and attach responsibility to it."); *see also Canterbury v. Spence*, 464 F.2d 772, 790 (D.C. Cir. 1972); *Canesi ex rel. Canesi v. Wilson* 730 A.2d 805, 812 (N.J. 1999).

gestation" and concluded that "[t]he most significant fetal risk in this situation is stillbirth." Cook's affidavit did go on to state that had Kimberly been informed of the risks specific to her situation "it is very possible she would have opted for an induction earlier in her pregnancy, an in-hospital delivery with greater antenatal and intrapartum fetal surveillance, and/or a c[a]esarean delivery." Accordingly Cook's affidavit established one aspect of proximate cause: that the Goodwins would have opted for different treatment had they been properly informed of the risks.

But Cook's statements are not sufficient evidence of medical causation. Nothing in Cook's testimony rebuts Dr. Melinek's expert opinion that the stillbirth was caused by an infection unassociated with the conduct of the Midwifery. Cook's testimony provided her expert opinion that the Midwifery "failed to meet applicable standards of care, and thus contributed to the [stillbirth]." Yet she repeatedly declined to state a medical diagnosis or cause of death. Cook also indicated that she could not give a cause of death due to inadequate records and would defer to specialists on that determination. Therefore, her statements are not evidence that opting for midwife delivery was a "substantial factor" in Jackson's death.[69]

The evidence provided by the Goodwin's earlier expert, Osborne, is similarly lacking. Osborne's affidavit stated that the Midwifery "failed to meet expected standards of care" in several respects, which "were substantial contributing

---

[69]    *See* RESTATEMENT (SECOND) OF TORTS § 432(1) (AM. L. INST. 1965) ("[T]he actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent."); *id.* cmt. a ("If, without the actor's negligent conduct, the other would have sustained harm, the same in character and extent as that which he receives, the actor's conduct . . . is not even its *necessary antecedent*, and so is not a substantial factor in bringing it about." (emphasis added)); *id.* cmt. b ("[T]his Subsection is . . . applicable where the actor's tortious conduct consists in a failure to take some precautions which are required for the protection of another's person . . . . In such case, if the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible factor in bringing it about and cannot be a substantial factor in producing it.").

factors in the [stillbirth]." But the affidavit did not opine on the medical condition that caused Jackson to stop breathing. It suggested only that some earlier action should have been taken. And at her deposition Osborne stated that she did not know what caused Kimberly's placenta to stop oxygenating Jackson; when asked whether that sort of analysis was beyond what she was asked to perform for this case, she agreed. Osborne stated she was "curious" about the diagnosis of chorioamnionitis but conceded that this was "not [her] area of expertise." In discussing evidence relevant to the timing of the injury Jackson suffered, she conceded again that it was "not [her] area of expertise at all."

Therefore, Osborne's statements do not dispute Dr. Melinek's opinion that (1) the cause of Jackson's death was "that the placenta and umbilical cord supplying blood to the infant were damaged by an infection prior to delivery"; (2) "[c]horioamnionitis and funisitis are well-described natural causes for intrauterine fetal demise regardless of type of delivery and type of obstetrical care"; and (3) there is "no pathologic evidence that supports the claim" that the Midwifery "caused the demise of Jackson Goodwin in their care and treatment" of Kimberly during delivery. The Goodwins simply failed to present expert evidence that created a dispute of fact about medical causation.

The Goodwins also argue that expert evidence was unnecessary to establish causation. They suggest that the causal link between the Midwifery's course of treatment and Jackson's death can be inferred from the sequence of events described in the record. We disagree.

We explained in *Culliton v. Hope Community Resources, Inc.* that "expert testimony is not required 'in non-technical situations where negligence is evident to lay people.' "[70] But "[i]f the connection between the defendant's conduct and the plaintiff's

---

[70]     491 P.3d 1088, 1094 (Alaska 2021) (quoting *D.P. v. Wrangell Gen. Hosp.*, 5 P.3d 225, 228 (Alaska 2000)).

-25-                                                                7733

injury is not readily apparent to a lay person relying on 'everyday experience,' the opinion of a medical expert is required to establish this connection."[71]

In this case medical expertise is essential to establishing medical causation. Lay people's ordinary experience does not allow them to reliably decide whether opting for delivery by midwife care, as opposed to hospital care, was a substantial factor in Jackson being stillborn. The Midwifery's expert, Dr. Melinek, opined that the stillbirth was caused by an infection that damaged "the placenta and umbilical cord supplying blood to the infant." But it is unknown when this infection began or when it became fatal to Jackson. We do not know whether Jackson would have been born alive had Kimberly been under the care of an obstetrician or had opted not to obtain pregnancy care under the direction of midwives. This question involves the interplay between obstetrical practice and the nature of Jackson's underlying condition, which lay people cannot reliably answer without the help of an expert.

Without expert testimony to rebut Dr. Melinek's opinion that Jackson's death was caused by an infection and that there was no evidence the Midwifery's care contributed to his death, the Goodwins could not prove that the Midwifery is liable for the stillbirth under either a negligence or informed consent theory.[72] We therefore affirm the superior court's summary judgment in favor of the Midwifery and its denial of reconsideration.

---

[71] *Id.* at 1097.

[72] *See id.* at 1096 ("A complete lack of evidence establishing causation is grounds for summary judgment in favor of the defendant."); *see also Greywolf v. Carroll*, 151 P.3d 1234, 1241 (Alaska 2007) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (alteration in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))).

**B.** **The Superior Court Did Not Abuse Its Discretion In Awarding Enhanced Attorney's Fees.**

The Goodwins challenge the superior court's award of enhanced costs and fees. "[I]n general, a trial court has broad discretion to award Rule 82 attorney's fees in amounts exceeding those prescribed by the schedule of the rule, so long as the court specifies in the record its reasons for departing from the schedule."[73] Although "[a] Rule 82(b)(3) award of full fees is manifestly unreasonable absent a finding of bad faith or vexatious conduct,"[74] we have previously held that a 75% fee award "does not constitute a 'substantially full award' and thus does not require vexatious or bad faith conduct."[75] "[M]ere evasiveness in responding, contentiousness over difficult issues, or delay in completing testimony do not, in themselves, constitute bad faith or vexatious conduct."[76] Instead, "[c]onduct justifying an increased award must be such that the parties are prevented from litigating the action on an equal plane."[77]

The superior court awarded enhanced fees under Rule 82(b)(3) at a cumulative total of 64.5%. To support its award, the court made detailed findings of fact relevant to Rule 82(b)(3)(A)-(K): (1) this case was extremely complicated; (2) the parties were "diametrically opposed" in their view of liability; (3) the Goodwins' theories of liability changed over the course of litigation as they retained new experts; and (4) the Goodwins had trouble retaining experts and were not candid regarding why they were having these problems. The court also found that over the course of the case the Goodwins' claims became "unsupported and unsupportable," which they "couldn't or wouldn't" acknowledge, as shown by routinely missed deadlines.

---

[73] *Johnson v. Johnson*, 239 P.3d 393, 400 (Alaska 2010) (quoting *United Servs. Auto. Ass'n v. Pruitt ex rel. Pruitt*, 38 P.3d 528, 535 (Alaska 2001)).

[74] *Id.* (internal quotation marks omitted).

[75] *Cole v. Bartels*, 4 P.3d 956, 961 (Alaska 2000).

[76] *Kowalski v. Kowalski*, 806 P.2d 1368, 1373 (Alaska 1991).

[77] *Id.*

The court also found that the Goodwins engaged in "vexatious or bad faith" conduct beginning in April 2019 because the Goodwins "knew they no longer could meet their causation burden of proof, yet they hid that for *two years* as they tried to get 'something' for settlement." The court relied on statements by the Goodwins' own former attorney.[78]

This award was not an abuse of discretion. The court calculated the amount of fees by awarding full fees for certain time periods, but the cumulative award itself — 64.5% of reasonable, actual fees — falls below the threshold of "substantially full."[79] Therefore, findings of vexatious or bad faith conduct were not required. Even so, the court provided detailed factual support for its findings of vexatious and bad faith conduct.

The Goodwins also challenge the court's reliance on Alaska Civil Rule 95(a), which permits the court to assess attorney's fees or costs as a penalty for violation of the Civil Rules. "[W]hen assessing attorney's fees under Rule 95(a), the superior court must provide an explanation of its reasons for assessing the fees, and the preferred practice is to cite a specific rule that has been violated."[80] The Goodwins argue that "the trial court did not specify what rules the Goodwins had violated and how the alleged conduct of the Goodwins justified the enhanced award of fees."

The superior court's order was adequate. Citing to a specific rule is the "preferred practice,"[81] but failure to do so is not always reversible error. The superior court stated that the Rule 95(a) award was justified for "the reasons stated above" —

---

[78] The Goodwins argue that the Alaska superior court erred by making an award of attorney's fees permissible only under Civil Rule 68, pertaining to offers of judgment, even though the Midwifery did not make a valid offer of judgment. We disagree. The court clearly explained that Rule 82, not Rule 68, served as the basis for enhanced fees, and the court's analysis tracks the requirements of Rule 82.

[79] *Cole*, 4 P.3d at 961.

[80] *In re Schmidt*, 114 P.3d 816, 826 (Alaska 2005).

[81] *Id.*

i.e., its discussion of factors under Rule 82(b)(3). There the court noted that the Goodwins "fail[ed] to provide even the most basic discovery, including taking literally years and multiple motions and orders to get [the Goodwins] to sign their interrogatories under oath." The court also noted that the Goodwins missed deadlines and failed to litigate the case. These comments adequately describe violations of the Civil Rules and therefore provide a sufficient basis for the Rule 95(a) award.

Finally, the Goodwins argue that the superior court erred by awarding the Midwifery the cost of experts who did not testify. They cite Alaska Civil Rule 79(f)(7), which limits expert costs to the time spent testifying.[82] However, the superior court awarded the expert costs under Rule 95(a), which is not limited in the same way.[83] Therefore, the superior court made no error in awarding these costs.

## V. CONCLUSION

We AFFIRM the judgement of the superior court.

---

[82] Alaska R. Civ. P. 79(f)(7) (allowing witness fees described in Alaska Admin. R. 7); Alaska Admin. R. 7(c) ("Recovery of costs for a witness called to testify as an expert is limited to the time when the expert is employed and testifying and shall not exceed $150.00 per hour, except as otherwise provided in these rules.").

[83] Alaska R. Civ. P. 95(a) (permitting allocation of costs for "infraction" of Civil Rules "as the circumstances of the case and discouragement of like conduct in the future may require").